**PRESCOTT, BALL & TURBEN and Elliot Associates, Plaintiffs,**

v.

**The LTV CORPORATION, LTV International, N.V. and Wilson Foods Corporation, Defendants.**

**No. 81 Civ. 3917 (CBM).**

United States District Court, S. D. New York.

July 1, 1981.

Kleinberg, Kaplan, Wolff & Cohen, P. C., New York City, for plaintiffs; Norris D. Wolff, Fredric A. Kleinberg, Steven Y. Hochberg, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendants; Robert B. Fiske, Jr., Joel B. Gardner, Roger N. Pyle, Hannah Berkowitz, New York City, of counsel.

## MEMORANDUM OPINION

MOTLEY, District Judge.

On June 26, 1981, plaintiffs brought on the instant matter by order to show cause seeking both declaratory and injunctive relief. For the reasons given below, plaintiffs' request for preliminary injunctive relief is denied.

*The Facts*

Plaintiffs, Prescott, Ball & Turben (PBT) and Elliot Associates (Elliot), are respectively Ohio and New Jersey limited partnerships involved in the trading of securities. Plaintiffs currently both own 5% Guaranteed (Subordinated) Debentures (the Debentures) of one of the defendants, LTV International, N.V. (LTV International). PBT is the current holder of $2,261,000 principal amount of the Debentures, and Elliot is the current holder of $1,518,000 principal amount of the Debentures.

The Debentures were issued pursuant to a Trust Indenture dated July 1, 1968 (the Trust Indenture). The Debentures are guaranteed by LTV Corporation (LTV), a Delaware corporation of which LTV International is a wholly owned subsidiary. LTV International is incorporated in the Netherland Antilles. As provided by the Trust Indenture, the Debentures are convertible into LTV common stock. PBT's and Elliot's Debentures are respectively convertible into 96,793 and 64,985 shares of common. The Debentures are listed on the New York Stock Exchange (NYSE) and are currently traded on the NYSE. According to an affidavit from a member of the Elliot partnership submitted in support of the instant motion, the Debentures are currently trading at an amount in excess of $900 per debenture, an amount significantly in excess of the $600 face value of each of the Debentures. *See* Moving Affidavit of Paul R. Singer, at 4.

At meetings of the Board of Directors of LTV (the Board) on April 19, 1981, and May 15, 1981, the Board agreed to a proposal which would distribute all the shares of Wilson Foods Corporation (Wilson), a whol-

ly owned LTV subsidiary, to holders of LTV common stock on a pro rata basis. The proposed transaction would involve distribution of 100% of Wilson's stock to LTV's shareholders, with no surrender in return of either stock or cash by the LTV common stockholders participating in the distribution.

Wilson is currently a major going concern involved in the slaughtering of various types of livestock and the packing and shipping of meat. In the last fiscal year, Wilson reported sales in excess of two billion dollars, although it suffered a slight loss on those sales. Wilson accounts for approximately 11% of the total asset value of LTV, and about 25% of its annual total revenues. Wilson's balance sheet indicates a net worth for the corporation of approximately $86,000,000 as of December 31, 1980. According to the prospectus circulated by LTV in connection with the proposed Wilson distribution, the distribution will reduce LTV's stated capital by $62,445,000 and its retained earnings by $30,285,000.

LTV has filed a registration statement with the Securities and Exchange Commission, and this statement has already gone effective. *See* Form S–1, Wilson Foods Corporation Registration No. 2–72304 (Filed May 16, 1981). LTV has also already given notice of the "record date," the date on which the corporation will determine who will be entitled to participate in the Wilson distribution by virtue of being a holder of record of LTV common stock on that particular date. The record date is July 10, 1981. Thus, holders of the Debentures will have to decide by July 10, 1981, whether to convert their debentures for LTV common in order to share in the Wilson distribution.

*Discussion*

The legal controversy between the parties is narrow and sharply defined. Plaintiffs contend that the proposed distribution of Wilson stock to the common stockholders of LTV is in derogation of their rights as holders of the Debentures, and activates certain provisions of the Trust Indenture intended to protect those rights. Defendants disagree and seek to characterize the proposed distribution as simply a dividend to LTV shareholders. As the following discussion will make clear, the heart of this controversy, as well as its resolution, lies in the provisions of the Trust Indenture. The pertinent portions of the Trust Indenture will therefore be reproduced and examined in some detail.

Section 4.06 of the Trust Indenture provides in pertinent part:

In case of any capital reorganization ... of the Guarantor [LTV] ..., there shall be no adjustment of the conversion price pursuant to Section 4.04 hereof but each Debenture shall after such capital reorganization ... be convertible into the kind and amount of shares of stock or other securities or property of the Guarantor, ... to which the holder of the number of shares of Common Stock deliverable (immediately prior to the time of such capital reorganization ...) upon conversion of such Debenture would have been entitled upon such capital reorganization ...; and in any such case, if necessary, appropriate adjustment shall be made in the application of the provisions set forth in this Article Four with respect to the rights and interests thereafter of the holders of the Debentures, to the end that the provisions set forth in this Article Four shall thereafter correspondingly be made applicable, as nearly as may reasonably be, in relation to any shares of stock or other securities or property thereafter deliverable on the conversion of the Debentures. . . .

Plaintiffs contend that the proposed distribution of Wilson shares is a "capital reorganization" for purposes of § 4.06. If they are correct, defendant LTV would be required under the terms of § 4.06 to hold back enough shares of Wilson to accommodate holders of the Debentures should they subsequently decide to convert their debentures into shares of LTV common. Defendants dispute the applicability of § 4.06. They do not dispute that § 4.06 would require the "warehousing" of sufficient Wilson shares to satisfy the post conversion entitlements of the current debenture hold-

ers if, in fact, § 4.06 is applicable to the Wilson distribution. Instead, defendants contend that § 4.06 is not applicable to the proposed distribution of Wilson stock because the proposed distribution is more properly considered as a dividend to LTV shareholders than the type of transaction which the parties contemplated would be included under the term "capital reorganization" in § 4.06 of the Trust Indenture.

Defendants' position on the applicability of § 4.06 is also clear cut. In essence it has four steps. First, § 4.06 does not contain a definition of the term "capital reorganization." Second, other provisions of the Trust Indenture must be examined to see if they provide an indication of what the parties intended when they used the term "capital reorganization." Third, the provision of the Trust Indenture governing the types of notice which must be given to debenture holders in the event of certain transactions contains language proving that the parties intended the term "capital reorganization" to apply only to situations in which there was an exchange of stock. Fourth, since the holders of LTV common stock will retain their stock and not exchange it when they receive Wilson shares, the Wilson distribution is not, a priori, a capital reorganization for purposes of § 4.06.

Since defendants' entire argument is based upon the language contained in the Trust Indenture's basic notice provision, § 4.08, the court reproduces this section in its entirety while highlighting certain highly pertinent language:

Section 4.08: In case:

(a) the Guarantor shall declare a dividend (or any other distribution) on its Common Stock payable on or after February 1, 1969 otherwise than in cash out of its earnings; or

(b) the Guarantor shall authorize the granting on or after February 1, 1969 to the holders of its Common Stock of rights to subscribe for or purchase any shares of stock of any class or of any other rights; or

(c) of any capital reorganization or reclassification or change on or after

February 1, 1969 of the Common Stock of the Guarantor (other than a subdivision or combination of its outstanding Common Stock), or of any consolidation or merger on or after said date to which the Guarantor is a party and for which approval of any shareholders of the Guarantor is required and which will result in an exchange of Common Stock for securities or other property, or of the sale, or transfer on or after said date of all or substantially all of the assets of the Guarantor; or

(d) of the voluntary or involuntary dissolution, liquidation or winding-up of the Guarantor on or after February 1, 1969;

then the Guarantor shall cause to be filed with the Trustee and at the offices of the conversion agents specified in Section 5.02, and shall cause to be published at least once in the Authorized Newspapers, as promptly as possible but in any event at least 10 days prior to the applicable record date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights, or, if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution or rights are to be determined, or (y) *the date on which such capital reorganization, reclassification, change, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up is expected to become effective, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such capital reorganization, reclassification, change, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.*

Plaintiffs' application for preliminary relief thus presents the court with a very narrow and almost purely legal question for decision. The absence of factual controversy is exemplified by the decision of counsel for both sides to forego the presentation of

witnesses in favor of submission of plaintiffs' application for preliminary relief to the court on the basis of the briefs and arguments already presented. This case does not present the usual situation in which the court must make at best a tentative decision on the ultimate outcome of a controversy because the resolution of the controversy depends upon hotly contested facts presented in a hurried and incomplete form. The court is in possession of all the information necessary to decide the basic controversy between the parties.

■ Moreover, the relationship between the nature of the controversy and the law relevant to its resolution virtually require the court to actually construe the relevant provisions of the Trust Indenture. The Trust Indenture contains a choice of law provision which requires the application of New York law in construing the operation of the Trust Indenture. Both sides agree on the application of New York contract law to the dispute at issue. New York cases adopt the basic rule of contract construction which requires a court to resolve ambiguities in an agreement against the party which drafted the agreement. *See Broad v. Rockwell International Corporation*, 642 F.2d 929 (5th Cir. 1981) (applying New York law); *National Equipment Rental, Ltd. v. Reagin*, 338 F.2d 759 (2d Cir. 1964) (applying New York law); *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975); *Rentaways Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 126 N.E.2d 271 (1955).

■ Thus, the only way in which defendants may prevail is if the terms of the Trust Indenture unambiguously make clear that the parties did not intend to treat transactions like the Wilson distribution as a "capital reorganization." Anything less, even some level of ambiguity, will result in a construction of the Trust Indenture favoring plaintiffs. All parties agree that preliminary relief will only be appropriate if plaintiffs demonstrate:

(a) irreparable harm and (b) either (1) likelihood of success on the merits *or*

(2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. (Emphasis added.)

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). However, on the peculiar circumstances of this case, any consideration by the court of the basic dispute between the parties will lead to a virtually complete decision of the dispute. Specifically, for the reasons described below, a reading of the pertinent portions of the Trust Indenture convinces this court that § 4.06 is clearly inapplicable to the Wilson distribution. Plaintiff has therefore failed to demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id.*

■ The form of this court's decision, in addition to being as a practical matter unavoidable in the instant situation, will also serve the interests of both parties by insuring prompt appellate review of the narrow legal controversy involved here. This court feels the specific question of contract interpretation at issue may be properly presented for review on the record as it stands, since appellate review of a question as narrow and legally oriented as the instant controversy is bound to be essentially *de novo* in character in any case. *See Forts v. Ward*, 566 F.2d 849, 852 n.8 (2d Cir. 1977). The court will now turn its attention to a discussion of the disputed provisions of the Trust Indenture.

■ As described above, the controversy on the face of the document is straightforward. If the Trust Indenture contemplates an exchange of stock by the holders of LTV common shares as part of a "capital reorganization", then the Wilson distribution is not such a reorganization for purposes of § 4.06 of the Trust Indenture. Plaintiffs initially protest even the act of referring to § 4.08, the basic notice section of the Trust Indenture, to aid in construing the terms of § 4.06, the "anti-dilution" provision, the ap-

plicability of which is at issue here. Plaintiffs present no precedent in support of this position, and instead, this court adopts the position recently taken by the Fifth Circuit Court of Appeals that:

> ... under New York law, the entire contract must be considered, and, as between possible interpretations of an allegedly ambiguous term, that will be chosen which best accords with the sense of the remainder of the contract, and that interpretation is favored which will make every part of the contract effective.

*Broad v. Rockwell International Corp., supra,* 642 F.2d at 947 (and New York cases cited therein).

Plaintiffs appear to be arguing that whatever the law of contract interpretation, the court should not go outside the terms of § 4.06 because the term "capital reorganization" is applicable to the Wilson distribution by virtue of either the nature of the transaction or the customary understanding of investors about the meaning of the term "capital reorganization." Neither of these positions is wholly unpersuasive. The Wilson distribution will have an obvious and substantial effect on the capital portions of LTV's balance sheet. As described in the initial portion of the court's opinion, Wilson is a large going concern, and the distribution of its stock will definitely impact on LTV's stated capital and net worth. Moreover, distribution of all the shares of a wholly owned subsidiary is a common type of corporate transaction typically referred to as a "spin-off." *See* Thompson, *Registration of Stock Spin-Offs Under the Securities Act of 1933,* 1980 Duke L.J. 965, 989. Spin-offs are just as commonly referred to as reorganizations, particularly in the course of discussion about the appropriate tax treatment to be afforded such transactions. *Id. See also* Parker, *A Suggested Tax Treatment of Spin-Off Reorganizations,* 53 Cornell L.Rev. 700 (1968); *Commissioner v. Gordon,* 382 F.2d 499, 509 (2d Cir. 1967), *reversed on other grounds,* 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968).

Nevertheless, this court must reject both arguments in favor of searching the words of the various pertinent portions of the Trust Indenture itself. Similar arguments were recently rejected by the Supreme Court of Delaware in the somewhat similar case of *Wood v. Coastal States Gas Corporation,* 401 A.2d 932 (1979) (*Wood*). In *Wood* the Supreme Court of Delaware was called upon to determine whether a spin-off transaction was a "recapitalization" in order to determine whether certain holders of preferred stock would share in the distribution of stock. The word "recapitalization" was contained in the certificate which created the class of preferred stock whose holders were seeking rights to a portion of the stock which would be distributed pursuant to the spin-off. The Supreme Court of Delaware ultimately rejected invitations by the preferred stockholders to go beyond the language of the certificate, saying:

> The parties have also cited cases from other jurisdictions, but we are not persuaded that such cases considered language reasonably comparable to that at issue here; so they are of little help. And the same is true of general financial terminology. The point is that we must decide the controversy under the facts in this case and, for present purposes, that means the Certificate language.
>
> We agree with plaintiffs that the changes which the plan will bring to Coastal's financial structure are enormous. And it may be concluded that, collectively, these amount to a "reshuffling of the capital structure" under the general definition to which Professor Sametz testified. But that is not the test. *The critical question concerns what is said in the contract.*

401 A.2d at 939 (footnotes omitted, emphasis added). Plaintiffs strongly object to the citation of *Wood,* claiming that a "recapitalization" and a "capital reorganization" are different transactions. However, this distinction is irrelevant given the broader purpose for which the case is now cited.

Finally, having rejected plaintiffs' requests to either remain within the confines

of § 4.06 without referring to other provisions of the Trust Indenture, or alternatively, to go directly to parol evidence relating to the broader usage of the term "capital reorganization," the court is drawn inexorably back to the interrelationship between the two pertinent provisions of the Trust Indenture. Section 4.06 of the Trust Indenture provides for certain steps to be taken in favor of the Debenture holders in the event of, *inter alia*, a "capital reorganization." The term "capital reorganization" is not specifically defined anywhere in the Trust Indenture, including § 4.06.

However, the notice provision in the Trust Indenture, § 4.08, contains the following language, already highlighted above in the complete reproduction of Section 4.08 which is reproduced a second time in light of its crucial importance:

> (y) the date on which such capital reorganization, reclassification, change, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up is expected to become effective, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such capital reorganization, reclassification, change, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.

The plain meaning of this section is that in the course of each of the enumerated transactions, holders of LTV common stock "will be entitled to exchange" their shares for whatever "securities or other property" are "deliverable" in return. Obviously the language therefore suggests that in the view of the contracting parties, any of the enumerated transactions would include an exchange by LTV common stockholders of their shares.

Plaintiffs seek to avoid this reading of § 4.08 by arguing that a number of the types of transactions listed in § 4.08 will not include the exchange by LTV common shareholders of their stock for other stock.

In particular plaintiffs point to the fact that the list of transactions in § 4.08 includes transactions such as dissolutions, liquidations, and the complete winding-up of LTV. This argument must be rejected because it too narrowly confines the category of things which the LTV shareholder may receive in exchange for his stock. The section clearly states that a holder of LTV common stock would receive securities "or other property deliverable" upon the occurrence of any of the listed events. In the case of those events which call for a final distribution of LTV's assets rather than a change in the form of the ownership of those assets, the "other property deliverable" would obviously be cash or whatever other form of property the corporation's assets were ultimately distributed in.

The court admits that in the case of a winding-up, dissolution or liquidation there would very likely not be an "exchange" in the sense of trading one form of ownership for another. However, the lack of an exchange in the conventional sense results from the character of these particular corporate events. The lack of an exchange in the specialized situation of a corporation distributing its assets in the act of disappearing as a corporate entity does not create the sort of ambiguity in the language of § 4.08 which would render § 4.08 irrelevant to the construction of the term "capital reorganization." In sharp contrast to the term "capital reorganization," which can encompass a broad variety of corporate transactions even under the definitions of that term offered by plaintiffs, the terms liquidation, dissolution and winding-up refer to corporate transactions which are essentially statutory in nature and typically have a precise statutory meaning under the applicable corporation law of a particular jurisdiction. *See e.g.,* N.Y.B.C.L. Articles 5 (Liquidation), 10–11 (Dissolution). Del. Code Ann. tit. 8, §§ 271–284 (Winding Up and Dissolution), 291–303 (Liquidation).

The plain language of the Trust Indenture contemplates an exchange or altera-

tion in the existing ownership form of the interest held by LTV common shareholders before a particular transaction can be classified as a capital reorganization for purposes of the Trust Indenture. No such exchange or alteration is involved in the proposed distribution of Wilson stock. The proposed distribution therefore does not activate the requirements of § 4.06 of the Trust Indenture.

Instead, as defendants have contended, the Wilson distribution seems to be a dividend from LTV to its common stockholders. When the LTV Board of Directors approved the distribution of Wilson stock to LTV's shareholders, the distribution was explicitly described as a "dividend . . . payable . . . to the holders . . . of [LTV's] Common Stock." Affidavit of Justin J. Karl, Exhibit B, *The LTV Corporation Minutes of Special Meeting of the Board of Directors*, April 29, 1981 at 3. The notice provisions of the Trust Indenture specifically provide for non-cash dividends, and require the same type of notice for such non-cash dividends as for capital reorganizations. *See* Trust Indenture at § 4.08(a). Finally, it should be kept in mind that plaintiffs, as well as all other debenture holders, are perfectly free to convert their debentures into LTV common stock and thus participate in the dividend composed of Wilson stock.

For the reasons just given, plaintiffs' request for preliminary injunctive relief is denied. The foregoing constitutes this court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).