UNITED STATES TRUST COMPANY OF NEW YORK, as Trustee, The Chase Manhattan Bank, N.A., as Trustee, Sharon Steel Corporation, Inc., UV Industries, Inc. Liquidating Trust, and David Finkelstein, Arthur R. Gralla, Paul Kolton, Theodore W. Kheel, Edwin Jacobson and Martin Horowitz, as Trustees of the UV Industries, Inc. Liquidating Trust, Plaintiffs,

v.

EXECUTIVE LIFE INSURANCE CO., OCCI & Co., Staniels & Co., Nest & Co., Agway Insurance Company and First Missouri Bank & Trust Co., on Behalf of themselves and as representatives of a class of former Holders of 9¼% Senior Subordinated Notes Due April 15, 1987, Mimi Shapiro, Mortimer A. Shapiro, Pacific & Co., Cede & Co. and North Star Oil Company, on behalf of themselves and as representatives of a class of Holders of 9¼% Senior Subordinated Notes Due April 15, 1987, Butcher & Co., William W. Humphrey, Trustee, and Louis H. Spiner, Trustee, on Behalf of themselves and as representatives of a class of former Holders of 5⅜% Subordinated Debentures Due November 15, 1995, and Bear Stearns & Co., Cede & Co., Julian S. Goldberg, Mericka & Co., Mutual Shares Corp. and Mutual Qualified Income Fund, Saxon & Co., on Behalf of themselves and as representatives of a class of Holders of 5⅜% Subordinated Debentures Due November 15, 1995, Defendants.

No. 83 Civ. 8723 (DNE).

United States District Court, S.D. New York.

Nov. 20, 1984.

---

See also, 602 F.Supp. 942.

Carter, Ledyard & Milburn, Louis L. Stanton, New York City, of counsel, for plaintiff United States Trust Company of New York.

Dewey, Ballantine, Bushby, Palmer & Wood, John L. Collins, New York City, of counsel, for plaintiff Chase Manhattan Bank, N.A.

Shea & Gould, Ronald Lefton, New York City, of counsel, for plaintiff UV Industries, Inc. Liquidating Trust.

Shearman & Sterling, Robert Hausen, New York City, of counsel, for plaintiff Sharon Steel Corporation.

Donovan, Leisure, Newton & Irvine, Sanford M. Litvack, New York City, of counsel, for defendant Bear Stearns & Co.

Tenzer, Greenblatt, Fallon & Kaplan, William Klein, II, P.C., New York City, of counsel, for defendants Mutual Shares Corp. and Mutual Qualified Income Fund.

Davis Polk & Wardwell, Thomas J. Aquilino, Jr., New York City, of counsel, for defendant Butcher & Co. and the 5⅜% Selling Class.

Crystal & Driscoll, P.C., Stephen L. Crystal, New York City, of counsel, for defendants Mimi Shapiro and Mortimer A. Shapiro.

Danziger, Bangser, Klipstein, Goldsmith & Greenwald, Jonathan Fink, New York City, of counsel, for defendant Agway Insurance Company.

Fine & Ambrogne, Michael B. Roitman, Boston, Mass., of counsel, for defendant Nest & Co.

Milbank, Tweed, Hadley & McCloy, Carol J. Patterson, New York City, of counsel, for defendant Cede & Co.

## OPINION AND ORDER

EDELSTEIN, District Judge:

■ This is an interpleader class action, pursuant to 28 U.S.C. § 1335(a) and Fed.R. Civ.P. 23, brought, *inter alia*, by United States Trust Company of New York ("U.S. Trust") and the Chase Manhattan Bank, N.A., ("Chase") in their capacities as trustees for 9¼% Notes and 5⅜% Debentures issued by the now defunct UV Industries, Inc. ("UV").[1] U.S. Trust and Chase are holders of interest installments, together with accumulated earnings thereon, paid to the banks by UV's successor corporation, Sharon Steel Corporation ("Sharon"). The named defendants are sued on behalf of themselves and as representatives of four classes of debtholders who have possible claims to the interest installment funds held by the stakeholders, U.S. Trust and Chase.[2] On March 9, 1984, the court certified the four classes.[3] At a pretrial confer-

---

1. U.S. Trust is trustee for the 9¼% Senior Subordinated Notes. Chase is trustee for the 5⅜% Subordinated Debentures.

2. The four classes are as follows:
   (a) 9¼% Selling Class—All those persons or entities who held of record 9¼% Notes on April 1, 1980 and/or October 1, 1980 and/or April 1, 1981, and who subsequently transferred of record 9¼% Notes so held;
   (b) 9¼% Holding Class—All those persons or entities who, as of June 30, 1983, held of record 9¼% Notes that were transferred of record by a member of the 9¼% Selling Class after April 1, 1980;
   (c) 5⅜% Selling Class—All those persons or entities who held of record 5⅜% Debentures on May 5, 1980 and/or November 5, 1980 and/or May 5, 1981, and who subsequently transferred of record 5⅜% Debentures so held;
   (d) 5⅜% Holding Class—All those persons or entities who held of record as of June 9, 1983, 5⅜% Debentures that were transferred of record by a member of the 5⅜% Selling Class after May 5, 1980.

3. The certification order was filed by Judge Duffy. The case was transferred to me on May 24, 1984. Judge Duffy's order did not specify which provision of Fed.R.Civ.P. 23(b) was applicable. However, the factual background, *infra*, shows that the classes are certifiable under Fed. R.Civ.P. 23(b)(1)(A). The prosecution of separate actions by individual class members, the bondholders, would create the risk of inconsistent or varying adjudications with respect to the bondholders which would establish incompatible standards of conduct for the trustees in the disbursement of the interest funds. The class is also certifiable under Fed.R.Civ.P. 23(b)(1)(B) because adjudications with respect to the class representatives would, as a practical matter, be dispositive of the interests of the members of the classes and would not substantially impair or impede the ability of the other class members

ence in late May of 1984, all parties agreed that this case is appropriate for disposition on a motion for summary judgment because there are no material disputed issues of fact. The court then instructed the parties to submit cross motions for summary judgment.

## FACTUAL BACKGROUND

The facts of this case have previously been set forth in two opinions by Judge Werker and the opinion of the United States Court of Appeals for the Second Circuit. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 521 F.Supp. 104 & 521 F.Supp. 118 (S.D.N.Y.1981), *aff'd in part,* 691 F.2d 1039 (2d Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983).

Between 1965 and 1979, UV issued five separate indentures, two of which are the subject of this motion. The U.S. Trust Indenture was issued on April 15, 1977, under which UV borrowed approximately $25 million by issuing 9¼% Senior Subordinated Notes due in 1987. The Chase Indenture was issued on September 1, 1965, under which UV borrowed approximately $23 million by issuing 5⅜% Subordinated Debentures due 1979–1995.[4]

In March 1979, the stockholders of UV approved a plan of complete liquidation involving the eventual sale of UV's assets and distribution of the proceeds to UV's stockholders. UV set aside a $155 million fund to provide for its long term debt obligation. On November 26, 1979, after UV had disposed of most of its assets, UV reached an agreement with plaintiff Sharon for the sale of UV's remaining properties in exchange for cash, Sharon debentures and an assumption by Sharon of all UV's outstanding liabilities, including the two indentures at issue here, and the Manufacturers Indenture, which was the senior indebtedness.[5]

By letter dated December 24, 1979, the trustees issued notice of default to Sharon. The Manufacturers Indenture provides that a successor corporation can be substituted for UV as obligor only if the successor purchases all or substantially all of UV's assets. The trustees argued that because UV earlier had sold most of its assets, Sharon's purported assumption of the UV debenture obligations did not constitute a sale of "all or substantially all" of UV's property.

Also on December 24, 1979, Sharon filed suit against the trustees seeking a declaration that the trustees' notice of default was improper and that Sharon was a valid assignee under the Manufacturers Indenture.[6]

### The Selling Classes.

During the pendency of the litigation, Sharon declared semi-annual interest payments under both the U.S. Trust Indenture (the 9¼% Notes) and the Chase Indenture (the 5⅜% Debentures).[7] Under Section

---

to protect their interests. Moreover, the motions for class certification before Judge Duffy sought certification under Fed.R.Civ.P. 23(b)(1). Accordingly, the court deems the classes to have been certified under Fed.R.Civ.P. 23(b)(1).

No notice, at this point in the litigation, has been given to the individual class members. Under Fed.R.Civ.P. 23(c)(2), notice is only required for a class certified under Fed.R.Civ.P. 23(b)(3). Because this class was certified under Fed.R.Civ.P. 23(b)(1), no notice was required. However, notice will be given to the class members upon final disposition of the action. *See* Fed.R.Civ.P. 23(d).

4. Both indentures were subordinated to the Manufacturers Hanovers Trust Company Indenture ("Manufacturers Indenture"), which was UV's senior indebtedness. Under the Manufacturers Indenture, issued April 15, 1977, UV bor-

rowed approximately $75 million by issuing 8⅞% debentures due 1982–1998.

5. *See supra* note 4.

6. On January 15, 1981, U.S. Trust and Sharon entered into a settlement agreement which was approved by the majority of the holders of the 9¼% Notes prior to the conclusion of the Sharon action. By supplemental indenture dated May 6, 1981, Sharon succeeded UV as the obligor under the U.S. Trust Indenture.

7. Sharon declared semi-annual interest payments under the 9¼% Notes on April 1, 1980, October 1, 1980 and April 1, 1981. Sharon declared interest payments under the 5⅜% Notes on May 15, 1980, November 15, 1980 and May 15, 1981.

2.03 of the U.S. Trust Indenture and Section 2.05 of the Chase Indenture, payment was to be made to the then owners of the bonds. Sharon then deposited with U.S. Trust and Chase the full amounts of the semi-annual interest installments. The two Selling Classes are those bondholders who were record owners of the bonds at the time Sharon declared semi-annual interest payments, and who subsequently transferred those bonds to a member of the respective Holding Class.

Both U.S. Trust and Chase refused to distribute the interest payments deposited by Sharon to the Selling Class members because both indentures prohibited the payment of any monies on the subordinate indebtedness if there is a default on the senior indebtedness, the Manufacturers Indenture.[8] Because the Trustees had issued notices of default under the senior indebtedness and the issue of its default was before the United States District Court, U.S. Trust and Chase could not distribute the interest payments on the subordinate indebtedness.[9] On each regularly scheduled payment date, both banks sent notice to the bond holders that the interest installments received from Sharon would be held in separate accounts and invested in high-yielding money market instruments pending a determination of the persons entitled to the funds.

On May 29, 1981, the district court held that Sharon's attempted assumption of UV's obligations was invalid and that UV was in default under the Chase Indenture and the Manufacturers Indenture, the senior indebtedness. This ruling was affirmed by the Court of Appeals for the Second Circuit on September 28, 1982 and Sharon's petition for writ of *certiorari* was denied on February 28, 1983. On June 8, 1983, the district court filed an Amended Judgment, which concluded the declaratory judgment action instituted by Sharon. *See* Exhibit E to Chase Affidavit. The Amended Judgment, however, did not make any provision for the disposition of the funds deposited by Sharon.

*The Holding Classes.*

On May 5, 1983, the Manufacturers Indenture, UV's senior indebtedness, was fully paid. Thus, because the default on the senior indebtedness was cured, under the terms of the indenture U.S. Trust was able to disburse the interest installments on the 9¼% Notes previously deposited by Sharon. Pursuant to the terms of the U.S. Trust Indenture,[10] U.S. Trust declared a special

---

**8.** Section 13.03 of the U.S. Trust Indenture provides in part:

"In case any default shall occur in the payment of principal, whether at the expressed maturity thereof or upon acceleration (including any required sinking fund payments or required prepayments), of, or premium, if any, or interest on, any Senior Indebtedness, then during the continuance of any such default, the Company shall not pay, and neither the Trustees nor any holder of Notes shall be entitled to receive, any amount in respect of the principal of or interest on any Note."

Section 4.02 of the Chase Indenture provides in part:

"In the event and during the continuation of default in the payment of principal, sinking fund or interest with respect to any Senior Indebtedness or in the event and during the continuation of any default under any instrument constituting Senior Indebtedness or pursuant to which any Senior Indebtedness is issued, and continuing beyond the period of grace therefor, if any, specified in such instrument, no payment on account of principal, premium or interest on the Debenture shall be made."

**9.** On May 27, 1980, in the declaratory judgment action instituted by Sharon, the court denied Sharon's motion for an order compelling Chase to distribute the May 15, 1980 interest payment on the 5⅜% Debentures. The court stated:

"The provisions of the indentures under which Chase and U.S. Trust are acting as trustees prohibit the payment of any monies on the subordinate indebtedness if there is a default on the senior indebtedness.... If there is a default and if the trustees were to make the payments, they would subject themselves to a charge of breach of fiduciary duty."

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* No. 79 Civ. 6996 (S.D.N.Y. May 27, 1980).

**10.** Section 2.03 of the U.S. Trust Indenture provides in part:

"if and to the extent the Company shall default in the payment of the interest due on such Interest Payment Date, such defaulted interest shall be paid to the Persons in whose names outstanding Notes are registered at the close of business on a subsequent special record date established by notice given by

record date of June 30, 1983, for payment of the accrued interest. The 9¼% Holding Class consists of those persons or entities who, as of June 30, 1983, held of record 9¼% Notes transferred by a member of the 9¼% Selling Class.

Similarly, payment on the Manufacturers Indenture freed Chase, under Article IV of the Chase Indenture, to distribute the interest installments on the 5⅜% debentures. Pursuant to the terms of the Chase Indenture,[11] Chase declared June 9, 1983 as the special record date for payment of the accrued interest. The 5⅜% Holding Class consists of those persons or entities who, as of June 9, 1983, held of record 5⅜% debentures transferred by a member of the 5⅜% Selling Class.

To summarize, the Selling Classes in this case consist of those persons or entities who were holders of the bonds in 1980 when Sharon declared semi-annual interest payments on the bonds and deposited such interest with the trustees, and who sold the bonds prior to the special record date declared by the trustee for payment of the accrued interest. The Holding Classes consist of those persons or entities who obtained bonds transferred by members of the Selling Classes, and held those bonds on the special record date.

## DISCUSSION

██ This case involves interpretation of indentures which is ordinarily well-suited for a motion for summary judgment. *See, e.g., Sharon Steel Corp. v. Chase Manhattan Bank, N.A., supra; Zeiler v. Work Wear Corp.,* 450 F.Supp. 891 (S.D.N.Y. 1978); *Buchman v. American Foam Rubber Corp.,* 250 F.Supp. 60 (S.D.N.Y.1965). Based on the parties' affidavits, memorandum and statements submitted pursuant to Rule 3(g) of the civil rules for the Southern

District of New York, this court finds that there are no material disputed issues of fact. Accordingly, summary judgment is appropriate in this case. *See* Fed.R.Civ.P. 56(c).

Although the provisions of the U.S. Trust and Chase Indentures are similar, they are not identical and the court will discuss the provisions of each separately.

## THE U.S. TRUST 9¼% INDENTURE

Section 2.03 of the U.S. Trust Indenture provides that "[t]he person in whose name any outstanding Note was registered at the close of business on the Regular Record Date" (the Selling Class) is entitled to receive the interest payable on the Interest Payment Date. Section 2.03 provides one exception to this general rule:

"if and to the extent the Company shall default in the payment of the interest due on such Interest Payment Date, such defaulted interest shall be paid to the Persons in whose names outstanding Notes are registered at the close of business on a subsequent special record date established by notice given by mail by or on behalf of the Company to the holders of Notes ..."

Thus, if Sharon "defaulted" on the 9¼% Notes as that term is defined in the U.S. Trust Indenture, the members of the 9¼% Holding Class are entitled to the interest fund. Conversely, if Sharon did not "default" on the 9¼% Notes, the members of the 9¼% Selling Class are entitled to the interest fund.

Section 6.01 of the U.S. Trust Indenture defines "Event of Default" to include:

"(a) default in the payment of any installment of interest upon any of the Notes as and when the same shall be-

mail by or on behalf of the Company to the holders of the Notes not more than 45 days and not less than fifteen days preceding such special record date, such record date to be not less than ten days preceding the date of payment of such defaulted interest."

**11.** Section 2.05 of the Chase Indenture provides in part:

"if and to the extent the Company shall default in the payment of interest due on such interest payment date, ... such defaulted interest shall be paid to the person in whose name such Debenture is registered on the date of payment of such defaulted interest...."

come due and payable, and continuance of such default for a period of 30 days (it being understood that if the entire amount of such payment of interest is deposited by the Company with the Trustee ... before the expiration of such period of 30 days, such default shall no longer be considered to be continuing under this Indenture); ..."

Although the interest payments were not made to the Note Holders within the 30 day grace period, Sharon had duly deposited "the entire amount of such payment of interest" with U.S. Trust, the trustee. Therefore, the Selling Class contend that under Section 6.01 there was no "default" on the 9¼% Notes.

Under New York law, however, the entire contract must be considered and the court will favor an interpretation that gives effect to every part of the contract. *Broad v. Rockwell Int'l. Corp.*, 642 F.2d 929, 947 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (interpreting an indenture under New York law); *Prescott, Ball & Turben v. LTV Corp.*, 531 F.Supp. 213, 218 (S.D.N.Y.1981) (interpreting an indenture). Section 13.03 of the U.S. Trust Indenture provides that if the Company shall default on "any Senior Indebtedness, then during the continuance of any such default, the Company shall not pay, and neither the Trustees nor any holder of Notes shall be entitled to receive, any amount in respect of the principal of or interest on any Note." The Court of Appeals held and it is now undisputed that Sharon defaulted on the senior indebtedness, the Manufacturers Indenture. Thus, under Section 13.03, Sharon was prohibited from paying anything on the U.S. Trust indenture. Moreover, U.S. Trust, the trustee, and the holders of the Notes, the Selling Class, were "not entitled to receive" any interest payments.

Therefore, Sharon's deposit of the interest installments with U.S. Trust did not avoid a default under Section 6.01 of the U.S. Trust Indenture. U.S. Trust was duty-bound not to forward Sharon's inter-

est payments to the Note holders.[12] Sharon could not avoid default under the 9¼% Notes by depositing with the trustee interest payments that were expressly prohibited by Section 13.03 of the indenture. Only on May 5, 1983, when Manufacturers received full payment on the senior indebtedness, was Sharon permitted to pay, and the bondholders permitted to receive, the interest payments on the 9¼% Notes. Under Section 2.03, those holding the Notes at the later special record date, the 9¼% Holding Class, then became entitled to the interest payments.

Section 2.03 is similar to Section 307 of the Model Indenture Provisions—All Registered Issues—1967, which is considered in the American Bar Foundation's *Commentaries On Indentures*. The Commentaries explain that record dates and special record dates in the event of default are mechanisms that became necessary when notes began to be sold in large volume. *See* American Bar Foundation, *Commentaries on Indentures* 189 (1971) ("*Commentaries*"). *See also id.*, app. D at 4 ("[i]n dealing with payment of defaulted interest, the indenture should contain provisions to permit establishment of a record date for such payment on notice to holders"). The record date mechanism allows the trustee to perform the ministerial function of paying interest to the bondholders in an orderly and uniform manner. U.S. Trust correctly utilized the special record date mechanism in this case, entitling the 9¼% Holding Class to the interest fund.

The motion for summary judgment of the 9¼% Holding Class is granted and the motion of the 9¼% Selling Class is denied.

### THE CHASE 5⅜% INDENTURE

Section 2.05 of the Chase indenture provides that payment of interest is to be made to the owner of the debenture at the time payment was due, "*except* if and to the extent the Company shall default in the payment of interest due on such interest

**12.** *See supra* note 9.

payment date, in which case such defaulted interest shall be paid to the person in whose name such Debenture is registered on the date of payment of such defaulted interest...." As with the U.S. Trust Indenture, the issue is whether Sharon "defaulted" as that term is defined in the Chase Indenture.

Section 9.01 of the Chase Indenture defines default to include: "(b) failure duly and punctually to pay interest on any Debenture for a period of 30 days after such interest shall have become due and payable, *whether default arises as a result of the provisions of Article IV or otherwise.*" (Emphasis supplied). Article IV, Section 4.02, prohibits any interest payments on the debentures if the company defaults on any senior indebtedness.[13] It is undisputed that Sharon defaulted on the senior indebtedness, the Manufacturers Indenture. Thus, under Section 9.01(b), Sharon's failure to make interest payments to the bondholders "arose as a result of the provisions of Article IV" of the Chase Indenture. Sharon, therefore, "defaulted" as that term is defined in the Chase Indenture. Accordingly, the 5⅜% Holding Class is entitled to the interest pool.

■ It is clear that Sharon's deposit of the interest installments with Chase did not avoid default under Section 9.01(b). The emphasized phrase in Section 9.01(b) is similar in purpose and effect to one of the examples of "events of default" in Section 501 of the American Bar Foundation's Model Indenture provisions. *Commentaries,* § 501, at 204.[14] Referring to this section, the *Commentaries* state that the clause has the purpose of refuting any argument that events resulting from *force majeure* were not intended to be treated as defaults. *Id.* at 205. Similarly, the purpose and effect of Section 9.01(b) of the Chase

Indenture is that failure to pay the bondholders as a result of the provisions of Article IV constitutes a default. For purposes of this motion, the result would be the same under Section 9.01(b), whether or not Sharon deposited the interest payments with Chase.

The 5⅜% Selling Class contend that certain communications made by Chase to the members of the Selling Class constitute "circumstances surrounding the withholding" indicating that the funds were supposed to be paid to the Selling Class. Specifically, in a letter dated May 9, 1980, Chase informed the members of the Selling Class: "we are *for the present time* contractually prohibited from paying *to you* any part of the semi-annual interest installment due on the Debentures on May 15, 1980 that may be tendered or paid to us." Exhibit G to Chase Affidavit (emphasis supplied). The 5⅜% Selling Class contend that these and other communications "indicate a recognition and intent that the money paid by Sharon would eventually be released to the persons to whom it was owed, not to the persons who later acquired the 5⅜% Debentures ...." Memorandum in Support of Motion for Summary Judgment of 5⅜% Selling Class, at 12. The 5⅜% Selling Class is wrong for two reasons.

■ First, under New York law, matters extrinsic to an unambiguous indenture agreement may not be considered. *Teitlebaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 396 N.E.2d 1029, 1031, 421 N.Y.S.2d 556, 559 (1979); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.,* 25 N.Y.2d 535, 540, 255 N.E.2d 709, 712, 307 N.Y.S.2d 449, 452 (1969). For purposes of determining "default" and those persons entitled to the interest installments in the event of default, this court finds that the Chase Indenture is unambiguous. It is clear that under

---

**13.** *See Infra* note 8.

**14.** The example cited provides:
  " 'Event of Default', wherever used herein means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be affected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body)."

Section 9.01(b), "default" includes failure to make interest payments because of a default on the senior indebtedness. It is also clear that under Section 2.05, payment of the interest installments is to be made to those who are record holders when the defaulted interest is eventually paid.

█ Chase's communications with the Selling Class members cannot alter the express provisions of the indenture. "Indenture Trustees do not have power to compromise with the borrower or to vary the terms of the indenture." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1052 (2d Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983). If the Selling Class's claim is that Chase by its communications misled them into selling prematurely, their remedy is to sue Chase for breach of its fiduciary obligations.

█ Second, in the case of corporate notes, the general rule is that "accrued interest goes with an interest bearing obligation. It passes as an incident to the main obligation, unless expressly reserved." *Hudson Valley R.R. Co. v. O'Conner,* 95 A.D. 6, 10, 88 N.Y.S. 742 (3d Dep't 1904). *See also Commentaries,* § 3–7, at 190 ("conceptually the new owner of the debenture is considered to be the beneficial owner of the interest installment"). The Selling Class members sold their bonds at the risk that their right to the interest payments would necessarily be sold along with the principal amount of the notes. They were not compelled to sell; indeed some of the original holders of the Debentures did not sell. Those who sold at all times had it within their power expressly to reserve their right to the interest payments. For purposes of the present motion, the communications by Chase have no probative value as to who is entitled to

the interest payments under the terms of the indenture.

The 5⅜% Selling Class also contend that the sequence of payments made to Selling Class members constitutes a "circumstance surrounding the withholding" indicating that the interest fund at issue here was supposed to be paid to the Selling Class members. In the original judgment entered by the district court on August 19, 1981, the court ordered, *inter alia,* that during the pendency of the appeal to the Second Circuit, amounts equal to the semi-annual interest payments due on the debentures were to be paid to the debentureholders from earnings on the $155 million fund Sharon earlier had set aside to satisfy UV's long term debt obligation.[15] These court ordered payments were made on November 15, 1981, May 15, 1982 and November 15, 1982. The 5⅜% Selling Class contend that there thus has been "an anomolous gap" in the payments to the Class. That is, the 5⅜% Selling Class received interest payments on the debentures up until 1979 and then subsequently began receiving the court ordered "payments in lieu of interest" in November 1981. The interest installments at issue here would have been made during this "gap," but for Sharon's default on the senior indebtedness. The 5⅜% Selling Class contend that this gap in payments during a continuous period of debenture ownership "is a result too unnatural to have been the intent of any of the parties to the interest payment transactions." Memorandum of the 5⅜% Selling Class, at 14.

█ The 5⅜% Selling Class's reliance on the intent of the parties "to the interest payment transactions" is misplaced. Under New York law, the key issue is the intent of the parties to the indenture agreement and the manner in which that intent is reflected in the language of the indenture. *Broad v. Rock-*

---

15. The court had earlier imposed a constructive trust on the fund.

The payments ordered were not "interest payments," but payments "in lieu" of semi-annual interest on the 5⅜% Debentures. *See* Exhibit E to Chase Affidavit Amended Judgment, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* No. 79 Civ. 6996 at ¶ 4(b)(ii) (S.D.N.Y. June 6, 1983).

*well Int'l Corp.*, 642 F.2d 929, 946 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (interpreting an indenture under New York law). As expressed in Sections 4.02 and 9.01 of the Chase Indenture, the parties to the indenture agreement intended that during a period of default on the senior indebtedness, no interest payments were to be made on the 5⅜% Debentures. The payments in lieu of interest were ordered by the court to protect the interests of the 5⅜% bondholders during the pendency of the appeal. The 5⅜% Selling Class cannot transform court ordered payments for a period not in dispute into a right to be paid the interest for the defaulted interest period.

Moreover, under the terms of the indenture, "gaps" in the payment of interest during a continuous period of ownership were clearly contemplated by the parties to the indenture. A simple example will illustrate. Assume there are three interest installments to be made. The company promptly pays the first and third installments but defaults on the second. After the third installment is made, the bondholder sells. Subsequent to the sale the company pays the defaulted installment. Under Section 2.05 of the Chase Indenture, payment on installment number two is to be made, not to the original owner, but to the person who subsequently became the record owner. Thus, in the event of default, the indenture clearly contemplates the possibility of a "gap" in interest payments during a period of continuous ownership.

The motion for summary judgment of the 5⅜% Holding Class is granted and the motion of the 5⅜% Selling Class is denied.

## COSTS AND ATTORNEYS' FEES

■ The plaintiffs and defendant class representatives have requested costs, including attorneys' fees.

Plaintiffs' request for costs is denied. The provisions of the indentures do not warrant an award of attorneys' fees to plaintiffs in this case. Section 7.06 of the U.S. Trust Indenture and Section 10.06 of the Chase Indenture provide for reimbursement by the company of the trustee for all reasonable expenses, advances and disbursements of the trustee. Under these provisions, the expenses incurred by the trustees in this litigation should be reimbursed, if at all, by the company. That reimbursement should not come from the defendants in this action, the bondholders.

Furthermore, this interpleader action was brought primarily in Sharon's and the trustees' self interests. It relieved them of multiple suits and has resulted in the discharge of their obligations. *See Companion Life Ins. Co. v. Schaffer*, 442 F.Supp. 826, 830 (S.D.N.Y.1977). The determination of entitlement to interest payments is a cost of doing business that plaintiffs cannot, by the use of interpleader, transfer to the bondholders.

The defendant class representatives also have requested costs. Under Section 6.09 of the U.S. Trust Indenture and Section 9.10 of the Chase Indenture, all parties to the indentures agree that a court may in its discretion require "in any suit for the enforcement of any right or remedy under this indenture, ... the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and ... such court may in its discretion assess reasonable costs, including reasonable attorneys' fees against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant...." The indentures further provide that this provision shall not apply "to any suit instituted by the trustee or to any suit instituted by any Noteholder or group of Noteholders ... for the enforcement of the payment of the principal of, or interest on any Note on or after the due date expressed in such Note."

■ This suit, brought, *inter alia*, by the trustees, falls within the proviso to

Section 6.09 of the U.S. Trust Indenture and Section 9.10 of the Chase Indenture. This suit was brought by the trustees and will result in the "payment of ... interest on any Note on or after the due date expressed in such Note." Thus, under the indentures the parties have not "agreed" to a court assessment of attorneys' fees against any party litigant in this case. The court, however, under its general equitable powers, still has the power to award attorneys' fees to the class representatives. *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 605 (D.Colo.1974).

A class representative who protects or "recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). As the Supreme Court stated in *Boeing:*

> The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.... Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit.

*Boeing, supra,* 444 U.S. at 478, 100 S.Ct. at 949.

In this case, the representatives of the two Holding Classes have recovered the interest funds for their respective class members. The interest payments, originally due in 1980, have been held in high yielding money market instruments for the last four years. It would be inequitable for the Holding Class members to recover the money without having to pay the Holding Class representatives a reasonable attorneys' fee, proportionate to the benefit each class member has received.

The representatives of the 9¼% Holding Class and the 5⅜% Holding Class are thus ordered to submit fee applications. The court will carefully review the applications to determine whether the request represents reasonable compensation to the attorneys for their work, and whether the award would preserve the rights of the class members to the proceeds of the interest funds. *See Galdi Sec. Corp. v. Propp,* 87 F.R.D. 6, 13 (S.D.N.Y.1979). The class representatives are further ordered to send notice to the class members of the court's decision on the cross motions for summary judgment.

## CONCLUSION

The motions for summary judgment of 9¼% Holding Class and the 5⅜% Holding class are granted. The motions of the 9¼% Selling Class and the 5⅜% Selling Class are denied. The representatives of the 9¼% Holding Class and the 5⅜% Holding Class are awarded costs, including a reasonable attorneys' fee to be paid out of the class funds. The class representatives are ordered to send notice to the class members of this opinion and order.

SO ORDERED.