23 F.3d 539
 306 U.S.App.D.C. 231
 Alvin GANDAL, Appellee,
v.
TELEMUNDO GROUP, INC., Appellant,
ADVO System, Inc., et al.
Alvin GANDAL, Appellee,
v.
TELEMUNDO GROUP, INC., et al.
Alvin GANDAL
v.
TELEMUNDO GROUP, INC., et al., Reliance Group Holdings,
Inc., et al., Appellants.
 Nos. 92-7036, 92-7037, and 92-7039.
 United States Court of Appeals,
District of Columbia Circuit.
 May 20, 1994.
 
 Appeals from the United States District Court for the District of Columbia (89cv2563).
 Kathleen L. Beggs, with whom Jeremiah C. Collins, John J. Buckley, Jr., and Kevin M. Downey, Washington, DC, were on the brief, for appellants/cross-appellees Telemundo Group, Inc., et al.
 Glenn B. Manishin, with whom Jeffrey Blumenfeld, Washington, DC, was on the brief, for appellee/cross-appellant Gandal.
 Before: EDWARDS, RUTH B. GINSBURG*, and SILBERMAN, Circuit Judge.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SUPPLEMENTAL OPINION
 SILBERMAN, Circuit Judge:
 
 
 1
 On July 20, 1993, we dismissed Gandal's tort claims against three other defendants on the ground that the district court lacked personal jurisdiction. See Gandal v. Telemundo Group, Inc., 997 F.2d 1561 (1993). Our opinion did not address the appeals and cross-appeals concerning Gandal's efforts to recover from Telemundo because they were automatically stayed by an involuntary bankruptcy petition filed against Telemundo on June 8, 1993. That stay has now been modified to permit this Court to decide the appeals. This opinion incorporates the statement of facts from the earlier opinion and addresses the claims against Telemundo.
 
 
 2
 Gandal appeals the district court's decision that, as a warrantholder, he was not entitled to receive the same consideration that the corporation paid to employee-holders of restricted shares. The corporation cross-appeals and argues that the district court erred when it determined that warrantholders had a right to receive a $1.50 cash dividend paid to shareholders. We affirm the district court's decision as to the restricted shares, but reverse its ruling on the cash dividend because a genuine issue of material fact as to whether Gandal was actually injured remains unresolved.
 
 I.
 
 3
 At the outset we encounter Telemundo's argument that both of Gandal's contract claims are untimely. Telemundo contends that the statute of limitations began to run on Gandal's claim to the same consideration as the holders of restricted shares--at the very latest--on the date that the corporation purchased those shares, September 4, 1986. And Telemundo believes that the claim to the cash dividend accrued on the date (August 19, 1986) that the dividend was declared. Therefore, Telemundo insists that both contract counts of Gandal's suit, filed on September 15, 1989, fell outside of the District of Columbia's three-year statute of limitations period, D.C.Code Ann. Sec. 12-301(7) (1989). See Steorts v. American Airlines, Inc., 647 F.2d 194 (D.C.Cir.1981). Gandal responds that the earliest date on which the limitations period could be thought to begin was December 24, 1986, the formal consummation of the merger. Gandal further contends that the period did not actually commence until the date of the suit, September 1989, when Telemundo rejected Gandal's request for the $1.50 cash dividend and the cash paid for the restricted shares.
 
 
 4
 The statute of limitations period for a breach of contract action, of course, begins to run upon the breach. See, e.g., Western Union Tel. Co. v. Massman Constr. Co., 402 A.2d 1275 (D.C.1979). This ostensibly simple legal rule provides little help to us, because the nature of Gandal's claim makes ascertaining the exact date of the alleged breach difficult. Gandal contends that he was harmed by not having been offered the full compensation to which he was entitled. In other words, the corporation's failure to offer Gandal his due allegedly prevented him from exercising (or attempting to exercise) his warrant. The provision that Gandal claims was breached, section 10.5, did not become operative, by its own terms, until after the formal consummation of the merger on December 24, 1986. Accordingly, a breach could have occurred before that date only if there was an anticipatory repudiation of the contract by Blair.
 
 
 5
 We are confident, however, that Blair could not have breached its obligation to pay the warrantholders the same compensation as it paid shareholders until the latter amount was firmly set. And we think that the warrantholders would have harbored legitimate uncertainty as to that amount until the shareholders were actually paid the cash dividend on September 15, 1986. Gandal's claim to the cash dividend itself therefore is timely. His claim to the same compensation as the restricted shareholders is also timely because he seeks not just the cash that the restricted shareholders were paid on September 4, 1986, but also the $1.50 cash dividend they received on September 15, 1986. We therefore must consider the merits of Gandal's contract claims.
 
 II.
 
 6
 Gandal claims that the warrant agreement entitles him to receive the same compensation as was paid to the holders of restricted Blair shares--i.e., $22.25 in cash and 2.57 ADVO shares. Although the restricted shares were Blair common stock of the same type and class as the publicly traded Blair shares, the employees were compensated more favorably than other shareholders (at least before taxes) because, while both groups were given the ADVO shares and the cash dividend, employees received $20.75 in cash instead of the less valuable junk bond. Gandal points out that, although the warrant agreement states that warrantholders will receive the same "kind and amount" of compensation as shareholders, it does not specify which group of shareholders provides the relevant baseline for comparison in the event that one group is treated better. He urges us to interpret this ambiguity against Telemundo and read the warrant agreement as incorporating a "most-favored shareholder" principle to the benefit of warrantholders.
 
 
 7
 Although acknowledging that the warrant agreement provides that New York law controls, Gandal, noting the absence of New York caselaw directly on point, suggests we rely upon the Delaware Supreme Court's recent decision in Continental Airlines Corp. v. American General Corp., 575 A.2d 1160 (Del.), cert. dismissed, 498 U.S. 953, 111 S.Ct. 376, 112 L.Ed.2d 390 (1990). In that case, the Delaware Court held that a holder of Continental warrants was entitled to receive the same compensation package as employees who held restricted shares. Rejected was the argument of the surviving corporation, Texas Air, that employee compensation was unrelated and incomparable to the merger consideration offered to other shareholders and that the agreement did not envision that warrantholders would be able "to pick and choose" among different forms of consideration legitimately offered to shareholders. Instead the court concluded that, "when Texas Air granted an option to some of the stockholders of Continental (the employee-stockholders), it was required [to] offer the same consideration to [the warrantholder]. Texas Air cannot escape the plain language of Sec. 3.8 [of the Continental warrant agreement]." Id. at 1167.
 
 
 8
 The language of our Blair warrant agreement, however, does not mirror Continental's section 3.8. Section 3.8 provided that the warrantholder would be able to exercise his warrants in exchange for "such shares of stock, securities or property as may be issued or payable with respect to or in exchange for ... outstanding shares of such Common Stock." And the section clarified that it was "applicable, as nearly as may be in relation to any stock, securities or assets." Id. at 1165 (emphasis added). That wording strongly supports a "most favored shareholder" interpretation. The analogous clause of the Blair warrant agreement (section 10.5), however, provides that after a merger a warrantholder shall receive:
 
 
 9
 the kind and amount of shares and other securities and property (including cash) which he would have owned or have been entitled to receive after the happening of such [merger] had such Warrant been exercised immediately prior to such [merger].
 
 
 10
 The Blair language, read precisely, raises no ambiguity as to which shares of common stock provide a basis for calculating a warrantholder's compensation--they are the shares that "he would have owned or have been entitled to receive" immediately prior to the merger. A non-employee like Gandal could never have owned or received restricted shares, and so the compensation paid to the holders of those shares is irrelevant. Gandal is entitled only to what was paid for the precise type of shares that he was eligible to receive if he had exercised his warrants.
 
 
 11
 By ensuring that warrantholders are treated the same as shareholders, the anti-dilution clause in the Blair warrant protects the interests of warrantholders (who do not have any corporate voting rights) from subordination by a self-interested shareholder vote to accept a merger. The clause does not seem designed to hinder the board's efforts to help a small class of restricted employee-shareholders avoid unfavorable tax consequences. It is true that a corporate purchase of restricted shares (particularly where board members hold some of those shares) could disguise self-dealing by a board. But in that situation the warrant agreement would not leave the warrantholders without a remedy. The shareholders certainly could recover damages in such circumstances for a breach of fiduciary duty. Because the warrantholders have a contractual right to receive the same total merger consideration as the shareholders, the warrantholders could then bring an action for the same amount under the warrant agreement. The warrant agreement thus permits the warrantholder to bring a contract claim alleging that the board violated its duty to the shareholders, even though the board may owe no fiduciary duty to the warrantholders themselves. Although it strikes us as exceedingly unlikely that any such violation would not be challenged by the shareholders themselves--allowing warrantholders to then piggyback on the shareholders' claim--we see no reason why a warrantholder could not raise this type of claim directly if, as here, no shareholder brought a tort action against the board. Gandal, however, does not raise this theory of recovery explicitly. And even if we concluded that Gandal somehow indirectly made out this type of claim, by arguing that the purchase of the restricted shares violated both his contractual rights and Blair's fiduciary duty to him as warrantholder, he would still run into the statute of limitations. The breach of contract under this theory would have occurred when the board allegedly violated its fiduciary duty to the shareholders. That would have taken place no later than September 4, 1986, when the restricted shares were purchased. Gandal's suit filed on September 15, 1989, would not fall within the three-year statute of limitations period for contract actions.
 
 III.
 
 12
 Telemundo challenges the district court's determinations that Gandal had a contractual right to receive the cash dividend and that Gandal was entitled to $1.50 per warrant in damages. It is argued that Gandal lacks "equitable standing" to complain about warrants he purchased after the terms of the merger were publicly announced (such warrants constitute a majority of Gandal's warrants). Telemundo would have us accept this notion because it supposedly furthers the public policy forbidding the buying of a lawsuit, see Blasband v. Rales, 971 F.2d 1034, 1040, 1045 (3d Cir.1992), and prevents plaintiffs from receiving a windfall; in Telemundo's view, the market price of the warrant quickly reflected the impact of Blair's action.
 
 
 13
 Telemundo's equitable standing argument--which has little to do with Article III standing, and is properly understood as an estoppel notion--suffers several analytical flaws. Most of the cases on which Telemundo relies involve derivative suits. Such cases typically hold that a shareholder can initiate a derivative action only if he owned stock on the date of the alleged wrong. See, e.g., Lewis v. Anderson, 477 A.2d 1040, 1046 (Del.1984). That doctrine may make sense in the unique context of derivative actions. Damages (or the disgorgement of profits) in those suits are generally paid to the corporate treasury rather than directly to shareholders. It does not matter whether a derivative suit is brought by a holder of a single or a thousand shares because there is no direct per share recovery. In many cases, the real party in interest and the only person that benefits substantially from the suit is the plaintiff's attorney who takes his fee from the common recovery fund. The contemporaneous ownership rule, therefore, may well be intended to prevent lawyers from buying one share of stock (and a derivative lawsuit) after a corporation makes an even remotely controversial decision. Cf. R. CLARK, CORPORATE LAW Sec. 15.4 at 651 (1986). The rule is perhaps best understood as one of several legal devices (along with requirements that plaintiff post security for the defendant's expenses and deference to the recommendations of special litigation committees) designed to deter frivolous derivative suits.[1]
 
 
 14
 To be sure, Telemundo does cite a few non-derivative cases that apply the equitable standing doctrine. But none of them are New York cases, and they all involve tort actions. Some courts may bar suits by individuals who became shareholders only after an alleged tort occurred because in some metaphysical sense they were not injured. But whatever the validity of this theory for torts, it has little application to a contract action. A warrant agreement provides the holder with a bundle of rights, and we see no reason why the transferability of those rights should be limited.
 
 
 15
 Employing a variation on its standing theme, Telemundo contends that allowing Gandal to recover on his post-merger warrants would violate New York contract law. Telemundo argues that, under New York's mutual assent doctrine, if a party assents to a contract with knowledge of the other party's construction of a term, the assenting party cannot later contest the meaning of that term. See, e.g., Murphy v. Gutfreund, 583 F.Supp. 957, 961-62 (S.D.N.Y.1984); see also RESTATEMENT (2D) OF CONTRACTS Sec. 20(2) (1981). At the time of the merger Gandal was aware of the limited compensation that Blair was offering to warrantholders, and now, according to Telemundo, Gandal cannot claim a right to additional compensation for his post-merger warrants.
 
 
 16
 The record is actually unclear as to when Gandal became aware of Blair's interpretation of the warrant agreement. Telemundo suggests that Gandal had access to Reliance's June 5th tender offer, the amended tender offer of June 19, 1986, and the June 2 merger agreement, all of which stated that warrantholders would be entitled only to 2.57 shares of ADVO and the junk bond. But since the $1.50 cash dividend was not announced until July 3, 1986, none of these documents could have clearly indicated whether Blair thought warrantholders were entitled to the cash dividend. The date on which Blair clearly stated its interpretation of the warrant therefore remains uncertain, and because Gandal bought warrants at several different times, if Telemundo's interpretation of New York law were correct we would have to remand for a determination of which warrants were to be included in any recovery.
 
 
 17
 We think a remand on that issue is unnecessary, however, because Telemundo applies the mutual assent doctrine out of context. That doctrine prevents a party who after accepting another party's idiosyncratic interpretation of a contract term, then sues to recover damages based on a more natural construction of the term. This scenario assumes a traditional bilateral contract arrangement and necessarily implies not only that a party state its interpretation of the contract term clearly, but also that the other side manifest its assent to that interpretation. The doctrine therefore has no application in the context of a transferable contract like a warrant agreement. Gandal bought the warrants from a third party and neither Gandal nor the third party ever specifically agreed to Blair's interpretation of the contract. See Sharon Steel Corp. v. Chase Manhattan Bank, 691 F.2d 1039, 1048 (2d Cir.1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983) (noting that the provisions of standardized securities contracts "do not depend on the particularized intentions of the parties"). The district court correctly observed that Telemundo's suggested construction of the mutual assent doctrine would allow a corporation to breach the warrant agreement lawfully, at least as to after-acquired warrants, simply by declaring its intention to do so, which would neatly destroy the market in warrants. See Gandal v. Telemundo Group, Inc., 781 F.Supp. 39, 48 (D.D.C.1992).
 
 
 18
 Telemundo nevertheless protests that permitting Gandal to recover on his post-merger warrants will provide him with an undeserved windfall. Telemundo assumes that if a corporation illegally gives insiders the equivalent of a dollar a share, the market will instantly discount the value of the shares by a dollar. In that case, Telemundo reasons, allowing recovery on after-acquired shares would result in a dollar a share windfall.
 
 
 19
 Telemundo's contention has surface plausibility but is actually circular. It depends on legal assumptions that it asserts. If the market discounts share value based on the assumption that late-acquired warrants cannot participate in the recovery, then relaxing that assumption and allowing recovery on those shares will create a windfall. If instead, however, the market assumes that the late-acquired shares can participate in the recovery, then the market will discount the value of the shares only by the amount of lost value multiplied by the probability that a suit to recover the loss will be unsuccessful. For example, if the market estimates that a suit to recover a dollar per share of corporate waste has a 50% chance of success, the share value will drop by only 50 cents a share, and the holder of the late-acquired shares would acquire only a 50% chance of recovering a dollar and so would not receive a windfall.
 
 
 20
 Telemundo's windfall argument, therefore, evaporates upon close scrutiny. There would be a windfall only if a court shifted from one clear rule to another, and New York does not have a clear rule. Nor is Telemundo's position supported by any other legal or economic considerations. It would only result in harm to existing warrantholders and the creation of market inefficiencies. As the examples above indicate, barring late-acquired shares or warrants from the recovery decreases the market price of the security immediately after an incident of corporate waste by the entire amount of the harm, while if participation is allowed the market value is reduced only to the extent that a lawsuit seems unlikely to succeed. Were we to accept Telemundo's position we would penalize current warrantholders who wish to sell their warrants (rather than sue), and thereby inefficiently make a warrant more valuable to a current owner than to prospective buyers. Cf. CLARK, Sec. 15.4 at 651.
 
 
 21
 Telemundo also disputes the district court's disposition of the merits of Gandal's claim to the $1.50 cash dividend. Telemundo relies principally upon section 10.4 of the warrant agreement which provides that, "no adjustment in respect of any dividends shall be made during the term of a Warrant or upon exercise of a Warrant." Telemundo argues that Gandal never exercised his warrants and therefore has no right to any dividends paid by Blair, including the $1.50 cash dividend paid on September 15, 1986. Gandal, however, points to section 10.5 of the warrant agreement which entitles each warrantholder to the "same kind and amount of shares and other securities and property (including cash )" to which the warrantholder would have been entitled had he exercised his warrant immediately prior to the merger. Gandal contends that this anti-dilution clause entitles him to exchange his warrants for the same consideration that shareholders received from the merger, including the $1.50 cash dividend. Telemundo insists that the cash dividend was not merger consideration because the dividend was paid three months before the consummation of the merger and, and as Blair's counsel during the merger put it, "if there had never been a merger, there still would have been a dividend." [Telemundo Brief at 32].
 
 
 22
 We agree with the district court that the circumstances in which the dividend was issued indicate that the dividend formed an integral part of the merger consideration. Telemundo concedes that the $1.50 dividend was offered to further Reliance's tender offer and was announced for the same reason as Reliance's earlier announcement that it would increase its own tender offer by a dollar a share. The dividend, moreover, was paid to only 40% of the shareholders (i.e., everyone but Reliance), the same 40% that were closed out on December 24, 1986--which makes its economic effect virtually the same as if Reliance had increased its price. Blair's proxy statement in regard to the merger noted that the junk bond was a fair offer to shareholders only "when viewed together with the tender offer, the cash dividend and the ADVO dividend." [J.A. at 188, 1006-08]. The dividend is not necessarily regarded as other than merger consideration merely because it was paid by the target (Blair) rather than the acquiror. See Continental, 575 A.2d at 1167. The only real distinction between the dividend and the other merger consideration is the three-month interval between the dividend payment and the formal consummation of the merger. But Telemundo's attempt to rely on December 24, 1986 as the key date for the merger for this purpose fares no better than Gandal's attempt to make that date the key for purposes of personal jurisdiction and the statute of limitations.
 
 
 23
 The cash dividend indisputably formed part of the merger consideration. Accordingly, there appears to be some tension between the warrant agreement's statement that warrantholders are not entitled to cash dividends and its requirement that shareholders and warrantholders receive equivalent merger consideration. But we think that section 10.4's dividend limitation expresses the general common sense notion that warrantholders do not become stockholders until they exercise their purchase option, and so do not ordinarily have any claim, upon exercise, to dividends that accrued while they held the warrants. In contrast section 10.5 appears to address specifically the treatment of warrantholders in the event of a merger. The specific provision, therefore, supersedes the language of the more general clause. See E. FARNSWORTH, CONTRACTS Sec. 7.11 at 264 n. 12 (1990) (collecting cases); cf. Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 2482-83, 41 L.Ed.2d 290 (1974) (stating that in statutory interpretation a specific statute will not be controlled by a more general statute). The warrantholders were accordingly entitled to receive the $1.50 cash dividend upon exercise of the option.
 
 
 24
 Gandal, of course, never exercised his option, which complicates the damage calculation (and other issues in this case) considerably. Gandal's entitlement to an extra $1.50 per warrant, if he had exercised, does not automatically qualify him for an award of $1.50 per warrant in damages, nor does it even establish that he suffered a legal injury. Gandal must demonstrate that the extra $1.50 would have made the warrants worth exercising. If, for example, the value of the junk bond, the 2.57 shares of ADVO and the $1.50 together was never greater than the option price of $36.75 then Blair's incorrect claim--that warrantholders were not entitled to the $1.50--did not harm the warrantholders. If, on the other hand, the junk bond and ADVO shares alone were worth more than $36.75 (or arguably $36.75 plus brokerage fees), then, contrary to Gandal's behavior, he should have exercised his option despite Blair's refusal to include the $1.50. Consequently, if Gandal failed to exercise his option under this latter scenario, Blair's contract violation would not have been the proximate cause of Gandal's injury.[2] In sum, since Gandal never exercised his warrants, he can only demonstrate a legal injury from Blair's actions if the value of the junk bond and the ADVO shares was always below $36.75 but at some point during the life of the warrants was above $35.25.[3]
 
 
 25
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 26
 The district court used similar logic to conclude that the maximum amount of damages to which Gandal was entitled was $1.50 per warrant.[4] While the ADVO shares were publicly traded and accordingly easy to value, the junk bond was not traded on a liquid secondary market, which makes valuation of Blair's compensation offer difficult. The district court relied on the principle that doubts arising in the calculation of damages should be resolved against the wrongdoer, see Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250-51, 75 L.Ed. 544 (1931); Western Geophysical Co. v. Bolt Associates, Inc., 584 F.2d 1164, 1173 (2d Cir.1978) (applying New York law); cf. SEC v. First City Fin. Corp., 890 F.2d 1215, 1231-32 (D.C.Cir.1989), and therefore awarded Gandal $1.50 per warrant.
 
 
 27
 The trouble with the district court's damage award is that its inability to determine the value of the junk bond with ease and precision not only raises uncertainty as to the exact amount of damages, that inability also creates doubt as to whether a legal injury actually occurred. As we noted, Telemundo only injured Gandal if the junk bond and ADVO shares were once worth at least $35.25, but never worth more than $36.75. Although uncertainty over the amount of damages is resolved in favor of the injured party, that party still has the burden of demonstrating that an injury actually occurred. See Berley Indus., Inc. v. City of New York, 45 N.Y.2d 683, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281, 282-83 (1978). As one New York court explained:
 
 
 28
 Damages will be awarded as long as they are not uncertain, contingent or conjectural and even where the amount cannot be determined with absolute certainty. There must, however, be some basis for computation in the evidence for determining the amount of the damages. And that basis must be supplied by the plaintiff.
 
 
 29
 Fendelman v. Conrail, 119 Misc.2d 302, 464 N.Y.S.2d 323, 329 (N.Y.Sup.Ct.1983) (citations omitted). From the record we cannot determine the value of the junk bond. Although Telemundo's expert valued the bond at $4.75, the district court noted evidentiary problems with that valuation. See Gandal, 781 F.Supp. at 49 n. 9. Gandal has yet to proffer any valuation, perhaps in part because the district court granted summary judgment on damages before either party requested it. At this juncture, we think the value of the bond is a disputed issue of material fact that makes summary judgment inappropriate.[5]
 
 
 30
 This is not to say that Gandal must provide a precise valuation of the junk bond in order to prevail. If Gandal can convince the finder of fact that the value of the bond was such that, in combination with the ADVO shares, it was worth somewhere between $35.25 and $36.75 (and no more), he will have satisfied his burden of proving a legal injury. And then the principle that uncertainties about the amount of damages are resolved in favor of the wronged party would apply to Gandal's claim, and he might well be entitled to $1.50 per warrant.
 
 
 31
 * * * * * *
 
 
 32
 The district court grant of summary judgment in favor of Telemundo on Gandal's claim to the same compensation as the restricted shareholders therefore is affirmed. The cash dividend ruling in favor of Gandal, however, is reversed because a genuine issue of material fact exists as to whether Gandal suffered any legal injury.
 
 
 
 *
 Former Circuit Judge Ruth B. Ginsburg, now an Associate Justice of the Supreme Court of the United States, was a member of the panel when the case was argued but did not participate in this opinion
 
 
 [1]
 To circumvent this estoppel rule, many Delaware plaintiffs' law firms own a virtual stable filled with one share each of many stocks in order to be prepared to bring derivative suits
 
 
 [2]
 The district court characterized Gandal as having a duty to mitigate damages if the value of the junk bond and ADVO shares exceeded $36.75, but the failure to exercise in this situation is more correctly described as a causation problem. After all, a duty to mitigate damages only exists after a legal injury has occurred, while Gandal's failure to exercise his option if the warrants were "above water" would mean that Blair's actions did not injure Gandal
 
 
 [3]
 
 
 
 [4]
 The district court presumably reasoned that if damages were calculated at the time most favorable to Gandal (i.e., the offered compensation was worth just under $36.75 so that on the date of injury he was wrongfully prevented from receiving just under $38.25 in value upon payment of $36.75) he would be entitled to $1.50 in damages with the damages calculated at the time of the breach. See Simon v. Electrospace Corp., 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971) (limiting a securities purchaser's recovery to the market value at the time of breach); see also Buford v. Wilmington Trust Co., 841 F.2d 51 (3d Cir.1988)
 
 
 [5]
 Gandal argues that because of the uncertainty over the valuation of the junk bond the proper remedy is specific performance. He views specific performance as entitling him to the ADVO shares and the junk bond in exchange for $35.25. The dispute over the existence of a legal injury makes disposition of Gandal's argument about the appropriate remedy unnecessary. In any event, even if specific performance were appropriate here, it would only apply to the difficult-to-value junk bond, not the publicly traded ADVO shares. Gandal would receive the junk bond in exchange for the difference between $35.25 and the market value of ADVO on whatever date the district court determined to be the date of the breach