# United States Court of Appeals
## For the First Circuit

No. 01-1613

PAUL R. LOHNES,

Plaintiff, Appellant,

v.

LEVEL 3 COMMUNICATIONS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, <u>Senior U.S. District Judge</u>]

Before

Selya, <u>Circuit Judge</u>,

Coffin, <u>Senior Circuit Judge</u>,

and Lipez, <u>Circuit Judge</u>.

<u>Michael Eby</u>, with whom <u>Robert E. McLaughlin, Sr.</u> and <u>Gilman, McLaughlin & Hanrahan LLP</u> were on brief, for appellant.
<u>Joseph E. Jones</u>, with whom <u>Fraser, Stryker, Meusey, Olson, Boyer & Block, P.C.</u>, <u>Paul G. Lannon, Jr.</u>, and <u>Holland & Knight LLP</u> were on brief, for appellee.

November 30, 2001

**SELYA, Circuit Judge.** The primary issue raised in this appeal is whether the terms "capital reorganization" and/or "reclassification of stock," as used in a stock warrant, encompass a stock split. Asserting the affirmative of this proposition, a warrantholder, plaintiff-appellant Paul R. Lohnes, claims that a stock split effectuated by defendant-appellee Level 3 Communications, Inc. (Level 3) triggered an antidilution provision in the warrant that automatically increased the number of shares of stock to which he was entitled. Level 3 resists this claim. The district court concluded that the language of the warrant could not reasonably be construed to encompass a stock split and, accordingly, granted Level 3's motion for summary judgment. Lohnes v. Level 3 Communications, Inc., 135 F. Supp. 2d 105, 106 (D. Mass. 2001). We affirm.

## I. BACKGROUND

Consistent with the conventional summary judgment praxis, our account of the relevant facts construes the record in the light most favorable to the nonmoving party (here, the appellant). McCarthy v. N.W. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).

The appellant is both a trustee and a beneficiary of C.E.M. Realty Trust (the Trust). In February of 1998, the Trust

leased 40,000 square feet of commercial space to XCOM Technologies, Inc. (XCOM). The details of the lease transaction need not concern us, save for the fact that, as part of the consideration, XCOM issued a stock warrant to the appellant. The parties negotiated the principal terms of the warrant — the number of shares, the exercise price, and the expiration date — and XCOM's lawyer then drafted the document. The warrant specified that its exercise would be governed by Massachusetts law. It empowered the holder to purchase, at his discretion but within a fixed period, 100,000 shares of XCOM common stock at $0.30 per share.

Unbeknownst to the appellant, XCOM's days as an independent entity were numbered. Shortly after the appellant executed the lease and accepted the warrant, Level 3 acquired XCOM in a stock-for-stock transaction and converted XCOM into a wholly-owned subsidiary. As part of this transaction, Level 3 agreed to assume XCOM's warrant obligations and satisfy them with shares of Level 3's common stock (using a designated share exchange formula). Following this paradigm, the appellant's unexercised warrant for XCOM shares was duly converted into a warrant to purchase 8,541 shares of Level 3's common stock. The appellant does not challenge this conversion (which took effect in April of 1998).

-4-

The next significant development occurred on July 14, 1998.  On that date, Level 3's board of directors authorized a two-for-one stock split, to be effectuated in the form of a stock dividend granting common shareholders one new share of stock for each share held.[1]  The board set the record date as July 30, 1998.  On July 20, Level 3 issued a press release announcing the stock split, but it did not provide the appellant with personalized notice.

The split occurred as scheduled.  Adhering to generally accepted accounting practices, Level 3 adjusted its balance sheet to account for the split by increasing its common stock account in the amount of $1,000,000 and reducing paid-in-capital by a like amount.  These accounting entries had no net effect on either the retained earnings or the net equity of the company.

_____

[1]A corporation effects a "stock split" by increasing the number of shares outstanding without changing the proportional ownership interests of each shareholder.  Companies typically execute a stock split by issuing a "stock dividend" to current shareholders, i.e., "paid in stock expressed as a percentage of the number of shares already held by a shareholder."  Black's Law Dict. 493 (7th ed. 1999) (cross-referencing definition of "dividend").  Stock splits lower the price per share, thereby fostering increased marketability and wider distribution of shares.
    Technically, not all stock dividends are stock splits, and the two may, in limited instances, receive different accounting treatment.  In the instant matter, however, "stock split" and "stock dividend" are two sides of the same coin, and we use the terms interchangeably.

Despite the sharp reduction in the share price that accompanied the stock split, the appellant paid no heed until approximately three months after the record date. When his belated inquiry revealed what had transpired, the appellant contacted Level 3 to confirm that the stock split had triggered a share adjustment provision, thus entitling him to 17,082 shares (twice the number of shares specified in the warrant). Level 3 demurred on the ground that the warrant did not provide for any share adjustment based upon the occurrence of a stock split effected as a stock dividend.

Dissatisfied by Level 3's response, the appellant exercised the warrant and received 8,541 shares of Level 3's common stock. He then sued Level 3 in a Massachusetts state court alleging breach of both the warrant and the implied duty of good faith and fair dealing. Citing diversity of citizenship and the existence of a controversy in the requisite amount, Level 3 removed the action to the federal district court. See 28 U.S.C. §§ 1332(a), 1441. The parties then engaged in a protracted period of pretrial discovery.

Discovery closed on October 30, 2000. Thereafter, Level 3 moved for summary judgment. See Fed. R. Civ. P. 56. The appellant's opposition to the motion included, inter alia, the affidavit of Jonathan C. Guest, whom the appellant held out

-6-

to be a securities expert.  Level 3 moved to strike the Guest affidavit.

In due course, the district court ruled that, as a matter of law, a stock split, effected as a stock dividend, did not constitute a "capital reorganization" as that term was used in the warrant and, accordingly, granted the motion for summary judgment.  Lohnes, 135 F. Supp. 2d at 106.  In its rescript, the court neither referred to the Guest affidavit nor ruled explicitly on Level 3's motion to strike that affidavit.  This timely appeal ensued.

## II.  METHODOLOGY OF REVIEW

We begin our analysis by outlining the legal framework that governs our review.  Next, we apply well-worn principles of contract interpretation to resolve the appellant's contention that the terms "capital reorganization" and "reclassification of stock" encompass a stock split implemented as a stock dividend.  In this endeavor, our principal task is to determine the ambiguity vel non of the disputed terms.  Thus, we investigate whether either term is reasonably susceptible to the interpretation urged by the appellant.  As part of this exercise, we consider (and reject) the appellant's belated attempt to introduce expert testimony bearing on this question.  We conclude by addressing the appellant's claim that Level 3

-7-

breached the implied duty of good faith and fair dealing inherent in the warrant.

We set out upon this odyssey mindful that the entry of summary judgment is justified only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once a defendant moves for summary judgment and places in issue the question of whether the plaintiff's case is supported by sufficient evidence, the plaintiff must establish the existence of a factual controversy that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). To carry this burden, the plaintiff must "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." McCarthy, 56 F.3d at 315.

We review the district court's entry of summary judgment de novo. Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). Thus, we are not wed to the district court's reasoning but may affirm its order on any independently sufficient ground. Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999); Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 (1st Cir. 1987). In

conducting our analysis, this court — like the district court — must scrutinize the record in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in that party's favor.  Garside, 895 F.2d at 48.

These principles have a nuanced application when a motion for summary judgment hinges upon an issue of contract interpretation.  In that type of situation, we have counseled that:

> While an argument between parties about the meaning of a contract is typically an argument about a "material fact," summary judgment is not necessarily foreclosed. Even if there is ambiguity in the language . . . the evidence presented about the parties' intended meaning may be so one-sided that no reasonable person could decide the contrary.

Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992) (citations omitted).  Accordingly, summary judgment may lie against a party who fails adequately to support its proposed interpretation of a purportedly ambiguous contract term.  See, e.g., In re Newport Plaza Assocs., 985 F.2d 640, 645 (1st Cir. 1993); FDIC v. Singh, 977 F.2d 18, 21 (1st Cir. 1992); see also Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981) (holding that there must be more than one "plausible definition" of contractual language to create a fact question).

III.  THE CONTRACT INTERPRETATION CLAIMS

A stock warrant is an instrument that grants the warrantholder an option to purchase shares of stock at a fixed price. See Black's Law Dict. 1441 (7th ed. 1999); II James Cox et al., Corporations § 18.15 (1995 & 1999 Supp.); 6A William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corps. § 2641 (perm. ed. 1997); see also Tribble v. J.W. Greer Co., 83 F. Supp. 1015, 1022 (D. Mass. 1949) (holding, under Massachusetts law, that a stock warrant is "a contract by which the corporation gives an irrevocable option to the holder to purchase authorized corporate stock within a period of time at a price and upon terms specified in the contract"). Against the backdrop of this well-established definition, we turn to the appellant's contract interpretation claims. We divide our discussion into seven segments.

## A. Applicable Legal Principles.

Time-honored principles of contract law govern our analysis. We begin with bedrock: the determination of whether a contract is ambiguous is a question of law within the province of the judge. Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989); RCI N.E. Servs. Div. v. Boston Edison Co., 822 F.2d 199, 202 (1st Cir. 1987). Contract language ordinarily is considered ambiguous "where an agreement's terms are inconsistent on their face or where the

phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Fashion House, 892 F.2d at 1083.

A court's determination that a contract is or is not ambiguous has important implications. If a court holds that a contract is unambiguously worded, it typically will construe the document based upon the plain and natural meaning of the language contained therein. Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995); Hiller v. Submarine Signal Co., 91 N.E.2d 667, 669 (Mass. 1950). For the most part, a court interpreting an unambiguous agreement need not consult extrinsic evidence to impart meaning to its terms. Smart, 70 F.3d at 179. A court may, however, consider extrinsic evidence for the limited purpose of evaluating whether a term is ambiguous in the first place, but only if the extrinsic evidence "suggests a meaning to which the challenged language is reasonably susceptible." Id. at 180.

If, however, ambiguity looms — that is, if "the plain meaning of a contract phrase does not spring unambiguously from the page or from the context" — then the interpretive function involves a question of fact. RCI N.E., 822 F.2d at 202. In such cases, a court may consider extrinsic evidence insofar as

it sheds light on what the parties intended.  <u>Robert Indus.,</u>
<u>Inc.</u> v. <u>Spence</u>, 291 N.E.2d 407, 409 (Mass. 1973).

### B.  <u>Parsing the Warrant</u>.

The warrant at issue here contained a two-paragraph antidilution provision which, upon the occurrence of certain described events, automatically adjusted the number of shares to which the warrantholder would be entitled upon exercise of the warrant.  In all, share adjustments were engendered by five separate contingencies:  capital reorganization, reclassification of common stock, merger, consolidation, and sale of all (or substantially all) the capital stock or assets.  However, the warrant did not explicitly provide for an adjustment of shares in the event of a stock split.  The appellant attempts to plug this lacuna by equating a stock split with a capital reorganization and/or a reclassification of stock.  This argument brings the following paragraph of the antidilution provision into play:

> <u>Reorganizations and Reclassifications.</u>
> If there shall occur any capital
> reorganization or reclassification of the
> Common Stock, then, as part of any such
> reorganization or reclassification, lawful
> provision shall be made so that the Holder
> shall have the right thereafter to receive
> upon the exercise hereof the kind and amount
> of shares of stock or other securities or
> property which such Holder would have been
> entitled to receive if, immediately prior to
> any such reorganization or reclassification,

-12-

> such Holder had held the number of shares of Common Stock which were then purchasable upon the exercise of this Warrant.

Building upon the premise that either "capital reorganization" or "reclassification of stock" encompasses a stock split, the appellant concludes that Level 3's stock split activated the share adjustment mechanism set forth in the quoted paragraph.

As said, the appellant bears the burden of establishing the existence of a genuine issue of material fact. Given the circumstances of this case, the only way for him to succeed in this endeavor is by showing that one of the disputed terms ("capital reorganization" or "reclassification of stock") is shrouded in ambiguity, that is, that reasonable minds plausibly could reach opposite conclusions as to whether either term extended to stock splits. To appraise the success of the appellant's efforts, we ponder each term separately.

## C. Capital Reorganization.

Since the warrant does not elaborate upon the meaning of "capital reorganization," we turn to other sources. Massachusetts law offers no discernible guidance. Outside of Massachusetts, the closest case is Prescott, Ball & Turben v. LTV Corp., 531 F. Supp. 213 (S.D.N.Y. 1981). There, the plaintiffs owned debentures, issued pursuant to a trust indenture, which were convertible into common stock of LTV Corp.

-13-

(LTV). LTV's board ratified a spin-off proposal calling for the distribution of all the shares of a wholly-owned LTV subsidiary to LTV's common stockholders on a pro rata basis. The distribution stood to reduce LTV's stated capital and retained earnings by $62.4 million and $30.3 million, respectively. Id. at 215. The plaintiffs argued that the proposed distribution of the subsidiary's stock entailed a capital reorganization that triggered an antidilution provision contained in the trust indenture.[2] The defendants countered that the spin-off was merely a dividend, and, therefore, did not trigger the share adjustment machinery established in the antidilution provision.

The Prescott court sided with the defendants. It noted that the "only way" the defendants could prevail was if the terms of the trust indenture made it unambiguously clear that the parties did not intend to treat the spin-off as a capital

---

[2]This provision read in pertinent part:

> [E]ach Debenture shall after such capital reorganization . . . be convertible into the kind and amount of shares of stock or other securities or property of the Guarantor . . . to which the holder of the number of shares of Common Stock deliverable (immediately prior to the time of such capital reorganization . . .) upon conversion of such Debenture would have been entitled upon such capital reorganization.

Prescott, 531 F. Supp. at 215.

reorganization. <u>Id.</u> at 217. Finding the terms of the trust indenture to be unambiguous, the court ruled that:

> The plain language of the Trust Indenture contemplates an exchange or alteration in the existing ownership form of the interest held by LTV common shareholders before a particular transaction can be classified as a capital reorganization for purposes of the Trust Indenture. No such exchange or alteration is involved in the proposed distribution of the [LTV subsidiary's] stock. The proposed distribution therefore does not activate the [antidilution adjustment provision in] the Trust Indenture.

<u>Id.</u> at 219-20.

The district court deemed <u>Prescott</u> dispositive, <u>see</u> <u>Lohnes</u>, 135 F. Supp. 2d at 106, and indeed, <u>Prescott</u> bears several similarities to the case at bar. In neither instance was the term "capital reorganization" defined in the controlling document or in the applicable state law. Moreover, the <u>Prescott</u> court was required to apply principles of contract law to construe the letter of the controlling document and determine whether a share adjustment provision designed to prevent dilution was triggered by a stock dividend. Finally, neither case involved an exchange of existing shares; rather, the stock split orchestrated by Level 3 was effected by distributing additional shares to its existing shareholders in much the same

-15-

manner that shares in the wholly-owned subsidiary were distributed to LTV's stockholders.

Despite these similarities, we stop short of endorsing the district court's declaration that Prescott should be given controlling effect. The Prescott court, finding cases from other jurisdictions and general financial terminology to be of "little help," ultimately restricted its analysis to the four corners of the trust indenture there at issue. 531 F. Supp. at 218. In contrast, we consider ourselves bound to grapple with the intricacies of Massachusetts law and, in performing that task, to search for guidance in case law from other courts, the statutes of foreign jurisdictions, and common financial usage — all of which are appropriate benchmarks for gauging the reasonableness vel non of the appellant's sweeping definition of "capital reorganization." Thus, we treat Prescott as suggestive evidence that stock splits do not constitute capital reorganizations, but refrain from according it decretory significance.

Also of interest is Wood v. Coastal States Gas Corp., 401 A.2d 932 (Del. 1979). There, a corporation's preferred shareholders challenged a settlement that required the parent corporation, inter alia, to spin off a subsidiary and distribute a portion of the subsidiary's stock to the parent company's

common shareholders. Id. at 935-36. The preferred shareholders argued that the spin-off constituted a recapitalization, thereby triggering an antidilution adjustment in their stock certificates. The court rejected this argument, holding that the settlement plan did not constitute a recapitalization. Id. at 941. Like Prescott, this case suggests that the term "capital reorganization" is not so elastic as the appellant claims, but it does not fully answer the question that we must decide.

Moving beyond the case law,[3] the meaning of the term "capital reorganization" in common legal parlance seemingly belies the appellant's ambitious definition. The preeminent legal lexicon defines "reorganization," in pertinent part, as a "[g]eneral term describing corporate amalgamations or readjustments occurring, for example, when one corporation acquires another in a merger or acquisition, a single corporation divides into two or more entities, or a corporation

---

[3]The appellant attempts to leverage a solitary dictum from Commissioner of Internal Revenue v. Marshman, 279 F.2d 27 (6th Cir. 1960), into a broad proposition that stock splits are the functional equivalent of capital reorganizations. The reference, contained not in the Marshman court's analysis but in its factual overview, id. at 29, had no bearing on the merits of the case (which dealt with the tax liabilities stemming from a husband's surrender of a stock-purchase option, pursuant to a divorce and property settlement). Accordingly, Marshman does not advance the appellant's cause.

-17-

makes a substantial change in its capital structure." <u>Black's</u> <u>Law Dict.</u> 1298 (6th ed. 1990). The first two prongs of this definition are clearly inapposite here. That leaves only the question of whether a stock split entails a "substantial change in [a corporation's] capital structure." We think not.

First and foremost, the accounting mechanics that accompany a stock split are mere window dressing. <u>See</u> <u>generally</u> Robert S. Anthony & James S. Reece, <u>Accounting Principles</u> 37-39 (7th ed. 1995). To be sure, a stock split effected through the distribution of shares in the form of a stock dividend results in an increase in the common stock at par account and an offsetting decrease in additional paid-in capital, <u>id.</u>, but this subtle set of entries has no effect on total shareholder equity or on any other substantive aspect of the balance sheet. <u>See</u> FASB, Accounting Research Bulletin No. 43; <u>see</u> <u>also</u> III Cox, <u>supra</u> § 20.20 ("A share split-up does not, however, make any representations as to any accumulation of earnings or surplus or involve any increase of the legal capital."). Because a stock split does not entail a substantial change in a corporation's capital structure, the unelaborated term "capital reorganization" cannot plausibly include a stock split effected as a stock dividend.

### D. **Reclassification of Stock**.

-18-

We turn next to the phrase "reclassification of stock." Two Massachusetts cases seem worthy of mention. In the first, a corporation took advantage of a new statute authorizing the issuance of preferred stock and amended its charter to divide its previously undifferentiated stock into common and preferred shares. Page v. Whittenton Mfg. Co., 97 N.E. 1006, 1007-08 (Mass. 1912). The Massachusetts Supreme Judicial Court approved the corporation's actions. It held that a corporation could classify stock into common and preferred shares (providing preferred shareholders with cumulative dividends and a liquidation preference) so long as that classification was effected through a charter amendment. Id. at 1007. Although Page uses the verb "classify," we view what transpired as a reclassification. See XIII Oxford English Dict. 339 (2d ed. 1989) (defining "reclassify" as "[t]o classify again; to alter the classification of").

In Boston Safe Deposit & Trust Co. v. State Tax Comm'n, 163 N.E.2d 637 (Mass. 1960), the court considered the tax implications of a reclassification of stock. The reclassification in question involved the partial substitution of redeemable, convertible, cumulative, nonvoting shares for nonredeemable, nonconvertible, noncumulative, voting shares. Id. at 642. The court held that the reclassification

-19-

constituted a taxable event under Massachusetts law.  Id. at 643.

Our reading of the Massachusetts cases leads us to conclude that the sine qua non of a reclassification of stock is the modification of existing shares into something fundamentally different.  At the end of the day, the stockholders in Page held a different class of shares, while the stockholders in Boston Safe gained some privileges while losing the right to vote.  Thus, Page and Boston Safe, respectively, illustrate two ways in which a security can be altered fundamentally:  (a) by changing the class of stock, or (b) by modifying important rights or preferences linked to stock.

Stock splits effected as stock dividends do not entail any such fundamental alteration of the character of an existing security.  For example, Level 3's stock split in no way altered its shareholders' proportionate ownership interests, varied the class of securities held, or revised any of the attributes associated with the stock.  What is more, the stock split did not have a meaningful impact on either the corporation's balance sheet or capital structure.  For those reasons, we perceive no principled basis on which to stretch the definition of "reclassification of stock" to encompass a stock split.

A rule promulgated by the Securities and Exchange Commission confirms our intuition. This rule extends the protections of the Securities Act of 1933 to shareholders who are offered securities in a business combination and are required to decide "whether to accept a new or different security in exchange for their existing security." SEC Rule 145, 17 C.F.R. § 230.145 (preliminary note). While the rule extends to reclassifications of stock, it explicitly exempts stock splits from the reclassification rubric. See SEC Rule 145, 17 C.F.R. § 230.145. The upshot of this carve-out is unmistakable: the SEC does not consider shares received in conjunction with a stock split to constitute a "new or different security."

To cinch matters, while no Massachusetts statute defines the term "reclassification of stock," two states have enacted pertinent statutes. Under Louisiana law, a reclassification of stock is defined as

> amendment of the articles to change the authorized number of shares of an existing class or series; to authorize shares of a new class or series; to change the designation, par value (including change of par-value shares to shares without par value or vice versa), preferences, limitations or relative rights, including cancellation or modification of the right to receive accumulated dividends which have not been declared, or variations in relative rights, of the issued, and authorized but unissued,

-21-

shares of any existing class or series; or to change the issued shares of any existing class or series into a greater or smaller number of shares of the same class or series (subject to such changes as the reclassification may make in the designation, par value, preferences, limitations or relative rights or variations in relative rights, thereof) or of another class or series, and to cancel any issued shares in connection with a reduction in the number thereof.

La. Rev. Stat. Ann. § 12:1 (West 2000). The stock split effected by Level 3 implicates none of the categories established by the Louisiana legislature.[4]

Pennsylvania's statutory definition goes one step further; it expressly provides that the term "reclassification" excludes "a stock dividend or split effected by distribution of [the company's] own previously authorized shares pro rata to the holders of shares of the same or any other class or series pursuant to action solely of the board of directors." 15 Pa. Con. Stat. Ann. § 1103 (West 2001).

---

[4]While Louisiana's definition of "reclassification of stock" encompasses a "change in the issued shares of any existing class or series into a greater or smaller number of shares of the same class or series," we believe that a stock split effected as a stock dividend does not trigger this contingency. The stock split at issue did not involve a change in the "issued" Level 3 shares, but, rather, the issuance of new Level 3 shares. The distinction is subtle, but it is real: the Louisiana reclassification rubric is designed to have effect when changes in the voting rights, proportional ownership, and dividend entitlement of previously issued shares are on the agenda. That was not the case here.

Although this case must be decided under Massachusetts law, we regard these statutes and rules as relevant and informative.  Cf. Ambrose v. New Engl. Ass'n of Schs. & Colls., Inc., 252 F.3d 488, 497-98 (1st Cir. 2001) (noting that, in exercising diversity jurisdiction, a federal court should consult case law from other jurisdictions when the forum state's highest court has not yet spoken).  Moreover, they afford enlightenment as to common usage and as to what a reasonable person would (or would not) consider to be encompassed within the ambit of a particular term.  So viewed, these statutes and rules reinforce our intuition that the term "reclassification of stock" does not encompass a stock split.[5]

To say more on this point would be supererogatory. Since Level 3's declaration of a stock split did not authorize a new class of stock, change the shareholders' proportionate ownership, alter the par value of the shares, or otherwise modify shareholders' voting rights or preferences, that action did not constitute a reclassification of stock.

---

[5]We note that the corporate codes of two other states likewise contain references to stock reclassifications that fortify our reading of Massachusetts law.  See Cal. Corp. Code App. § 1902 (West 2000) (listing accounting requirements for "reclassification of outstanding shares into shares of another class"); Md. Code Ann., Corps. & Ass'ns § 2-208 (West 2000) (requiring filing of supplemental articles if "board of directors classifies or reclassifies any unissued stock by setting or changing the preferences").

## E.  The Overall Plan of Reorganization.

The appellant also makes a conclusory claim that the July 1998 stock split was part and parcel of a comprehensive corporate reorganization (and, thus, animated the warrant's antidilution provision).  He did very little to develop this claim below, and he has not remedied that shortfall on appeal. For that reason, we deem the claim abandoned.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that, to preserve a point for appellate review, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work").

In any event, the claim lacks merit.  As best we can understand it, the appellant hypothesizes that the stock split was an offshoot of a corporate reorganization launched by Level 3 in 1997.  In that year, Level 3 shifted direction away from construction and mining activities in order to pursue its interests in communications and business services.  Between August 1997 and May 1998, the company dramatically modified its capital structure by splitting off its construction business and eliminating two series of stock.  Although none of these transactions involved XCOM or otherwise impacted the appellant, he implies that the July 1998 stock split, effected to increase the marketability of the company's shares as a prelude to

raising capital in the public markets, should be viewed as an essential component of the company's overall capital reorganization and stock reclassification, thereby triggering the warrant's antidilution provision.

We reject the appellant's intimation that the stock split is magically transformed into a capital reorganization or reclassification of stock based upon its inclusion in a long-term business plan that also contains a number of more complex financial maneuvers. Taken to its logical extreme, the appellant's argument invites us to deem any corporate activity engaged in by Level 3 while in the midst of reorganizing its capital structure as a capital reorganization and reclassification of stock. We are unable to perceive any principled basis on which we could accept this invitation.

## F.  The Expert's Affidavit.

Striving to stem this tide, the appellant hawks an affidavit from a Boston attorney specializing in securities law and corporate finance. This affidavit arguably embodies an expert opinion that the phrases "capital reorganization" and "reclassification of stock" each cover stock splits. The appellant seeks to forestall summary judgment on the strength of this opinion.

We need not evaluate the affidavit's probative value. Level 3 responded to it by filing a motion to strike and, even though the district court neither referenced the affidavit nor acted explicitly on Level 3's motion to strike, the most sensible reading of the record is that the court impliedly granted the motion. Cf. Wimberly v. Clark Controller Co., 364 F.2d 225, 227 (6th Cir. 1966) ("While it is certainly the better practice to specifically rule on all pending motions, the determination of a motion need not always be expressed but may be implied by an entry of an order inconsistent with granting the relief sought.").

It has long been accepted that a trial court may implicitly deny a motion by entering judgment inconsistent with it. In re Grand Jury Subpoena (Newparent, Inc.), ___ F.3d ___, ___ (1st Cir. 2001) [No. 01-1975, slip op. at 24]; Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993). In the same way, a court may grant a motion by taking an action consistent with the relief sought in the motion. E.g., Smartt v. Coca-Cola Bottling Corp., 337 F.2d 950, 951 (6th Cir. 1964). So here: we think that the lower court, by disregarding the Guest affidavit, plainly signaled its approval of the motion to strike.

Disregarding the affidavit was amply justified in this instance. The Civil Rules mandate that, in the course of

pretrial discovery, "a party shall disclose to other parties the identity of any person who may be used at trial to present [expert opinion evidence]." Fed. R. Civ. P. 26(a)(2)(A). Furthermore, a party retaining an expert must also submit to opposing counsel a detailed report covering, inter alia, the expert's qualifications, the gist of his opinion, and the sources of information underlying that opinion. Id. 26(a)(2)(B).

These directives are mandatory and self-executing. In Massachusetts, Local Rule 26.4 implements them and delineates special procedures regarding the automatic disclosures required by Rule 26(a)(2). See D. Mass. R. 26.4(a) (stating that, unless otherwise ordered, such disclosures "shall be made at least 90 days before the final pretrial conference").[6] The appellant made none of these disclosures during the discovery period and his submission of the Guest affidavit on February 9, 2001 — more than three months after the close of discovery and fewer than three weeks before the scheduled final pretrial conference — was nothing short of a sneak attack.

---

[6]In the case at bar, the final pretrial conference was scheduled to be held on February 26, 2001. Counting backwards ninety days, the Local Rules required the parties to make the disclosures in question by November 28, 2000.

The expert disclosure requirements are not merely aspirational, and courts must deal decisively with a party's failure to adhere to them. The Civil Rules provide in pertinent part that a party who "without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1); see also D. Mass. R. 26.4(b)(1) (providing for preclusion of expert witnesses not seasonably identified). We have explained before that Rule 37(c)(1) "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is mandatory preclusion." Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998).

On the face of things, there are two possible reasons why Rule 37(c)(1) might not apply in this situation. First, the rule places a burden on the objecting party to move for preclusion. But that requirement was satisfied here: Level 3 filed a timely motion to strike the expert's affidavit. In the context of a summary judgment proceeding, that was tantamount to a motion for preclusion. Second, Rule 37(c)(1) traditionally has been invoked to bar expert testimony at trial. Withal, the rule's phraseology applies with equal force to motions for

summary judgment.  See Fed. R. Civ. P. 37(c)(1) (stating, inter alia, that the court may preclude a party who fails to satisfy the disclosure requirements of Rule 26(a) from "us[ing] as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed").  The case law confirms our reading of the rule.  E.g., Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1007-09 (8th Cir. 1998) (applying Rule 37(c)(1) to exclude, during the summary judgment stage, affidavits by experts who were not adequately disclosed before the close of discovery); Black v. Columbus Pub. Schs., 124 F. Supp. 2d 550, 561 (S.D. Ohio 2000) (same).

We are cognizant that Rule 37(c)(1) contains a narrow escape hatch that allows the court to admit belatedly proffered expert evidence if the proponent's failure to reveal it was either substantially justified or harmless.  Neither branch of the exception applies here.  The appellant's response to the motion to strike Guest's affidavit was completely bereft of any explanation for neglecting to identify the expert before the close of discovery, and prejudice is apparent.  The appellant's failure to unveil his expert until after Level 3 had moved for summary judgment deprived Level 3 of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery.  This

is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate. See Thibeault v. Square D. Co., 960 F.2d 239, 244 (1st Cir. 1992) (explaining that expert disclosure rules were promulgated to facilitate a "fair contest with the basic issues and facts disclosed to the fullest practical extent"). Accordingly, we hold that the district court appropriately disregarded the belatedly proffered affidavit based upon the appellant's total failure to comply with the disclosure provisions set forth in Rule 26(a)(2).

### G. **The Denouement**.

Without the affidavit, the appellant plainly is fishing in an empty stream. We have found no legal usage of the terms "capital reorganization" or "reclassification of stock" that supports the proposition that a reasonable person plausibly could have believed that either term encompassed a stock split. This is made crystal clear when one contrasts the warrant received by the appellant with a warrant issued by XCOM approximately ten months earlier to a different party — a warrant that contained more than six full pages of antidilution protections (including explicitly-worded share adjustments for stock splits and stock dividends). Moreover, the appellant has failed to adduce any credible evidence that the parties here somehow intended to adopt such an unusually expansive

interpretation of the terms "capital reorganization" and/or "reclassification of stock."

If more were needed — and we doubt that it is — the maxim _expressio_ _unius_ _est_ _exclusio_ _alterius_ instructs that, "when parties list specific items in a document, any item not so listed is typically thought to be excluded." _Smart_, 70 F.3d at 179. Here, the warrant's antidilution protection extended expressly to five designated contingencies: capital reorganizations, reclassification of the common stock, merger, consolidation, or sale of all (or substantially all) the capital stock or assets. Since nothing within the four corners of the warrant hints at additional contingencies, we apply this maxim and conclude that the parties intended stock splits to be excluded from the list of events capable of triggering the share adjustment machinery.

The appellant is left, then, with his reliance on the principle of _contra_ _proferentum_ — the hoary aphorism that ambiguities must be construed against the drafter of an instrument. _E.g._, _Merrimack Valley Nat'l Bk._ v. _Baird_, 363 N.E.2d 688, 690 (Mass. 1977). This reliance is mislaid. In order to invoke this principle, the proponent first must demonstrate that there is an ambiguity. _Shea_ v. _Bay State Gas Co._, 418 N.E.2d 597, 602 (Mass. 1981). Here, the appellant has

failed to show that the interpretation which he urges is, "under all the circumstances, a reasonable and practical one."  Id. Accordingly, we have no occasion to apply the principle of contra proferentum.

**IV.  THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Although the terms "capital reorganization" and "reclassification of stock," as they appear in the warrant, are inherently unambiguous and do not encompass stock splits, the appellant mounts one further attack.  He posits that Level 3 had a legal obligation, under the implied contractual covenant of good faith and fair dealing, to provide him with personalized, advance warning of the stock split.  The appellant further argues that Level 3 breached this obligation by failing to advise him specifically about the adverse impact that the stock split would have on the warrant if the appellant did not exercise it before the record date.  This argument lacks force.

Under Massachusetts law, every contract includes an implied duty of good faith and fair dealing.  Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991). This implied covenant forbids a party from doing "anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." Drucker v. Roland Wm. Jutras Assocs., 348 N.E.2d 763, 765 (Mass. 1976)

(quoting <u>Uproar Co.</u> v. <u>Nat'l Broadcasting Co.</u>, 81 F.2d 373, 377 (1st Cir. 1936)).

The most prominent flaw in the appellant's attempt to wield this club is that he misperceives the fruits of the bargain that he struck. After all, a warrantholder does not become a shareholder unless and until he exercises his purchase option. <u>See</u> <u>Gandal</u> v. <u>Telemundo Group, Inc.</u>, 23 F.3d 539, 546 (D.C. Cir. 1994); <u>see</u> <u>also</u> Fletcher, <u>supra</u> at § 2641 ("A warrant holder becomes a shareholder on the date that he or she attempts to exercise his or her warrant."). Consequently, a warrantholder's right to insist that the corporation maintain the integrity of the shares described in the warrant, if it exists at all, must be found in the text of the warrant itself. <u>Helvering</u> v. <u>S.W. Consol. Corp.</u>, 315 U.S. 194, 200-01 (1942). Put another way, the fruits of the contract were limited to those enumerated in the warrant.

An examination of the warrant reveals quite clearly that Level 3 was not contractually bound to provide the appellant with individualized notice of the stock split. The warrant contained language stating that "[u]ntil the exercise of this Warrant, the Holder shall not have or exercise any rights by virtue hereof as a stockholder of the Company." This disclaimer hardly could have been written more plainly.

Furthermore, the warrant contained a notice provision which, by its terms, pertained to "notices, requests and other communications hereunder." Applying the settled definition of "hereunder," Level 3 was only obligated to provide notice for events contemplated in the warrant agreement. See VII Oxford English Dict. 165 (2d ed. 1989) (defining "hereunder"). Because the warrant contained no provision that even arguably required Level 3 to furnish individualized notice of the stock split to the appellant, the failure to give such notice could not constitute a breach of the implied duty of good faith and fair dealing.[7]

An illustrative case is FDIC v. LeBlanc, 85 F.3d 815 (1st Cir. 1996). There, the defendant acquired a parcel of property with borrowed funds, securing the loan with a mortgage and personal guaranty. Id. at 817. The FDIC, as receiver, succeeded to the lender's interests. Id. at 818. When it sought to collect on the guaranty, the defendant asserted that it had breached the implied duty of good faith and fair dealing under Massachusetts law by refusing to take steps desired by the

---

[7]We note in passing that Level 3's general press release announced the stock split ten days in advance of the record date and provided the appellant with constructive notice of the stock split. Thus, the appellant had ample opportunity to exercise the warrant and avoid the dilutive effects of which he now complains.

defendant but not required by the loan documents.  <u>Id.</u> at 821-
22.  Discerning no evidence that the FDIC had deprived the
defendant of the benefits of the loan agreement, we upheld an
order for summary judgment in favor of the FDIC.  <u>Id.</u> at 822.
We emphasized that, in the absence of an agreement to do
particular acts, Massachusetts law imposed no obligation on the
FDIC to take the "affirmative steps" that would have benefitted
the borrower.  <u>Id.</u>  While we readily acknowledged that the FDIC
had taken a "hard-nosed" approach, we pointed out that it had
"no duty at all" under the loan documents to act in the
borrower's interest.  <u>Id.</u>  So it is here:  Level 3 was under no
obligation to act affirmatively by providing the appellant with
individualized notice in the absence of a provision to that end
in the warrant itself.

## V.  CONCLUSION

We need go no further.  In light of the appellant's
inability to show that a reasonable person plausibly could
construe either "capital reorganization" or "reclassification of
stock" to include stock splits, we conclude that these terms, as
they appear in the warrant, were unambiguous and did not cover
the contingency of a stock split effected as a stock dividend.
It follows that the stock split in question here did not trip
the warrant's antidilution provision.  By like token, Level 3

did not breach the implied covenant of good faith and fair dealing by neglecting to give special notice beyond what the warrant itself required.  The bottom line, then, is that the district court was correct in granting Level 3's motion for summary judgment.

**Affirmed**.